Filed 6/30/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CORINA MUNOZ et al., | B249505 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC447232) |
| v. | |
| CHIPOTLE MEXICAN GRILL, INC., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Appeal dismissed.

Knapp, Petersen & Clarke and Stephen M. Harris for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Jason W. Kearnaghan, Daniel J. McQueen and Robert Mussig for Defendant and Respondent.

_____

Plaintiffs Corina Munoz and Keresha Edwards appeal from an order denying certification of a class of approximately 26,000 nonexempt California current and former employees of defendant Chipotle Mexican Grill, Inc. (Chipotle) regarding what plaintiffs allege is Chipotle's policy to require employees to purchase slip-resistant shoes from a vendor, Shoes for Crews, in order to work at Chipotle's restaurants. Plaintiffs further contend that Chipotle deducted the cost of these shoes from employee wages without obtaining the employee's written authorization, these deductions caused wages to dip below minimum wage, and Chipotle's pay stubs were noncompliant because they did not contain the start date for the pay period. Plaintiffs set forth these claims in seven causes of action, and Munoz seeks civil penalties on behalf of herself and "all current and former employees" under the Labor Code Private Attorneys General Act of 2004 (PAGA; Lab. Code, § 2698 et seq.) for all causes of action except their Business and Professions Code section 17200 claim.

We conclude that the trial court's order denying plaintiffs' class certification motion and granting Chipotle's motion to deny class certification is a nonappealable order because the PAGA claims remain in the trial court and the "death knell" doctrine does not apply under these circumstances. Accordingly, we dismiss plaintiffs' appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

**Plaintiffs' employment history and Chipotle's Shoes for Crews program and wage statements**

Munoz started working for Chipotle in July 2009 as a cashier in Chipotle's Victorville restaurant. According to Chipotle, it terminated her on September 9, 2010, because of a "fight she initiated with a co-worker." Edwards started working in August 2004 as a part-time cashier in Chipotle's Beverly Hills location. Chipotle asserts that it terminated her for theft in November 2009.

The parties dispute the contours of Chipotle's Shoes for Crews program, particularly as to plaintiffs' contention that Chipotle had a policy to require only verbal authorization for payroll deductions related to the program during the time period alleged for the proposed class. They also dispute whether Chipotle's wage statements uniformly

2

failed to set forth the beginning date for the pay period, and whether just listing the end date satisfied the applicable labor laws even if the start date could be deduced by counting back from the end date. Finally, they dispute Munoz's assertion that deductions for the Shoes for Crews program caused wages to dip below minimum wage, and in what Chipotle described as the "rare" instance when a deduction would cause wages for a pay period to fall below minimum wage, whether Chipotle reimbursed the affected employee for the cost of the shoes.[1]

**Plaintiffs' complaints**

Munoz filed the original class action complaint on October 12, 2010, in which she alleged violations of the following statutes: (1) Labor Code sections 2800 and 2802 (unpaid business-related expenses); (2) Labor Code sections 201 and 202 (wages not paid upon termination); (3) Labor Code section 204 (wages not paid during employment); (4) Labor Code section 226, subdivision (a) (improper wage statements); and (5) Business and Professions Code section 17200 et seq. She also sought civil penalties under the PAGA in each of the latter Labor Code causes of action on behalf of herself and "current or former employees" as "'aggrieved employees'" within the PAGA.[2]

On November 16, 2010, Munoz filed a first amended complaint, and on March 11, 2011, a second amended complaint in which she added a class claim for unlawful deductions under Labor Code sections 221 and 400–410 (unlawful business deductions). Specifically, she alleged that Chipotle forced employees to buy shoes from Shoes for Crews and then illegally deducted the cost of those shoes from employee paychecks. Both complaints contained PAGA allegations, including that Munoz was bringing those claims and seeking PAGA civil penalties on behalf of herself and "current and former employees."

---

[1] The evidence supporting the parties' respective factual contentions is summarized *post* in the discussion of the proceedings before the trial court.

[2] In their respective appellate briefs, plaintiffs and Chipotle state that the PAGA claims first appeared in the first amended complaint. Review of the original complaint in the record does not support that assertion.

On February 14, 2012, a third amended complaint (TAC) was filed, adding Edwards as a named plaintiff and a claim on behalf of Munoz and the putative class for nonpayment of minimum wages. In the TAC, Munoz seeks civil penalties for herself and "current and former employees" under the PAGA for all but her Business and Professions Code section 17200 causes of action. Edwards is not a named representative for the PAGA claims in the TAC, although she is a "former employee" on whose behalf Munoz is seeking PAGA civil penalties.

**The class certification proceedings**

*Plaintiffs' motion*

On February 1, 2013, plaintiffs filed their motion for class certification. In their TAC, plaintiffs alleged two subclasses: (1) an unpaid wages subclass for nonexempt California employees who worked for Chipotle within four years of the filing of the complaint until the date of certification; and (2) a noncompliant wage statement subclass consisting of Chipotle's nonexempt California employees who worked for Chipotle within one year prior to the filing of the complaint until the date of certification.

In their class certification motion, plaintiffs added a "Shoe Expenses Subclass": "All non-exempt or hourly-paid employees who worked for [Chipotle] in California beginning from the date when [Chipotle] started the Shoes for Crews program until October 12, 2010." Plaintiffs also modified their "Minimum Wage Subclass" to define the relevant time period as "beginning from the date when [Chipotle] started the Shoes for Crews program until the date on which [Chipotle] changed their Shoes for Crews payroll deduction policy to deduct shoe expenses from three separate pay periods."

Plaintiffs also asserted that if the three proposed subclasses were certified, the derivative claims also should be certified. Plaintiffs defined as "derivative" their claims under Labor Code sections 201–202 (wages not paid upon termination), 204 (wages not paid during employment), and 226, subdivision (a) (improper wage statements), and Business and Professions Code section 17200.

Prior to filing their motion, plaintiffs sent notices to approximately 16,000 potential class members pursuant to the procedures set forth in *Belaire-West Landscape,*

4

*Inc. v. Superior Court* (2007) 149 Cal.App.4th 554. Plaintiffs' counsel represented in their class certification motion that pursuant to the *Belaire-West* "process," Chipotle had "identified each and every putative class member through its payroll records."

In support of their class certification motion, plaintiffs filed the Edwards declaration. Edwards asserted that "Chipotle implemented a program in which employees were required to wear Shoes for Crews . . . brand slip-resistant shoes, or wear [Shoes for Crews] overshoes. Once this program was implemented, no other brands of shoes were permitted." In June 2009, she purchased shoes from the Shoes for Crews catalogue for $27.42, and that amount was deducted from her paycheck during the pay period ending on July 5, 2009, without her "express written authorization" during her employment or "otherwise." Chipotle never reimbursed her for this purchase.

With respect to her wage statements, Edwards declared that it was her "understanding that none of my wages statements listed a beginning date for the pay period for which I was being paid," and that she thus had to calculate the pay period "manually" on the assumption that the pay period started 14 days before the ending date on her wage statement. She also described her ability and willingness to be a class representative.

The motion included excerpts from Munoz's deposition in which she stated that nobody told her that the cost of shoes she needed for work would come out of her paycheck; she blamed Chipotle for her not being able to find employment when she was terminated. Plaintiffs also submitted five wage statements: three for plaintiff Munoz with no beginning date; and two for plaintiff Edwards, which included beginning and ending dates.

Plaintiffs relied heavily on Chipotle's interrogatory responses in asserting that it admitted not requiring written authorization during the time alleged in the "Shoe Expenses Subclass." More specifically, plaintiffs relied on Chipotle's following initial response to plaintiffs' special interrogatory No. 77: "As a general matter, no deductions were ever taken without the putative class member's consent. In or about September 2010, [Chipotle] began asking the putative class members to complete and sign a form

5

authorizing any deductions for shoes purchased from Shoes for Crews. Prior to that, [Chipotle's] policy was to obtain verbal consent to such deductions."

Later on, Chipotle supplemented its response to assert that it had always required written consent for Shoes for Crews payroll deductions. Chipotle's supplemental response also added that in early 2008 Chipotle required employees to wear safe shoes at work to avoid injuries. Chipotle implemented this requirement by informing employees of the requirement when they were hired, typically in the new-hire orientation. They were also informed that they could comply with Chipotle's "safe shoes requirement by (1) wearing the CrewGuard slip resistant overshoes available for free at every Chipotle restaurant; (2) wearing slip resistant shoes they already own; or (3) voluntarily purchasing slip resistant shoes from any retailer they choose, such as Wal-Mart, Payless or Shoes for Crews." The amended response also recited that employees could order shoes by telephone or online either through a dedicated Web site or Shoes for Crews's public Web site, and could pay for the shoes "any way they want," including through a payroll deduction "if they so requested and consented to in writing." "Beginning in mid-to late 2010," Chipotle required employees to "sign a form authorizing any deductions for shoes purchased from Shoes for Crews"; employees who purchased shoes on Shoes for Crews's dedicated Web site also had to complete the payroll deduction form.

In addition, plaintiffs submitted excerpts from the depositions of Chipotle's persons most knowledgeable, the director of security, safety and risk, Tim Spong, and the accounting manager for wage statements, Robert Evans.[3] Spong described the Shoes for Crews program as it was described in Chipotle's supplemental interrogatory response set forth *ante*, emphasizing that written authorizations were obtained before deductions for the cost of the shoes could be made from employee paychecks, and explaining why Chipotle could not produce copies of all those written authorizations, noting that "our managers are good at following our policies." He explained that Chipotle's original

---

[3] Plaintiffs also proffered certain of Chipotle's discovery responses, including those described *ante*; Spong e-mails; excerpts from Chipotle's handbooks; and four blank "Chipotle Payroll Payment and Shoes for Crews Request forms dated January 1, 2011."

discovery response was "in error" and "a mistake," which was "clarified" in Chipotle's supplemental response. According to Spong, "from day one . . . we've required consent. . . . [¶] [W]e've always had written consent for payroll deductions as a condition precedent to the payroll deduction program as rolled out." He explained that he did not catch the error when he verified the original discovery response.[4]

Spong testified that he was a proponent of the Shoes for Crews policy and the free "CrewGuards" for safety reasons. In trying to convince Chipotle to adopt the program, he noted Shoes for Crews's warranty policy that included medical costs if an employee slipped while wearing Shoes for Crews's products.

Spong stated that the shoes could be purchased for family and friends, and employees could purchase the shoes directly from Shoes for Crews without using the paycheck deduction option. He also testified that since late 2010 or early 2011, Chipotle limited the program to two pairs of shoes through the Shoes for Crews program via the "voluntary payroll deduction program," and that the dollar limit for such purchases is $50 or $55. These limitations were put in place based on discussions with legal counsel, and the limits were necessary to ease the program's accounting and administrative burden.

Evans was asked a question about a document not identified in the deposition excerpt in the record as to whether "all the wage statements" "looked like this?" He responded that there were "A.D.P. produced wage statements that look slightly different." Although the testimony is not entirely clear, Evans stated that one difference was the absence of a signature at the bottom of the document, but that the information on the document was "included on all pay statements that employees receive . . . ."

Evans confirmed that from the beginning employees had to authorize payroll deductions for the Shoes for Crews program in writing. He testified that the reference to "shoes" on another document that was not identified in the transcript excerpt was a code for whether the employee "had a voluntary shoes-for-crews deduction." He described the

---

[4] Plaintiffs submitted similar excerpts from the Spong deposition in opposing Chipotle's motion to deny class certification.

document as one not "normally used," and that he had seen it for the first time only on the preceding day. He testified that he could not be "certain" as to whether during the preceding five years wage statements given to an employee physically or via direct deposit were the same. For California employees, the pay period was two weeks in wage statements generated by ADP. He further testified as to another document unidentified in the record excerpt, that it appeared to be "representative" of a wage statement generated by ADP, that it included "the pay period end date which you can deduce the pay period begin date is 13 days prior," and that he did not know whether the law required that the beginning date be set forth on the wage statement.

Later on, Evans testified that some wage statements would list a beginning date for the pay period, generally those paychecks not prepared by ADP, and typically when an employee is terminated or otherwise "off-cycle."[5]

In opposing Chipotle's motion to deny class certification and in support of their reply brief for their motion to grant class certification, plaintiffs proffered the declaration of its statistics expert, Dr. Robert Fountain. Dr. Fountain stated that he was engaged to "prepare a methodology" to analyze payroll data to determine if Shoes for Crews deductions caused wages to fall below minimum wage. He stated that he used a spreadsheet "furnished" by plaintiffs' counsel that contained a list of all wage deductions for the Shoes for Crews program; he understood that the spreadsheet originated with Chipotle. "Based on the instructions of [plaintiffs'] counsel" and his review of the latter spreadsheet limited to the August 24, 2007 to October 12, 2010 time period, he opined: (1) of the 23,536 paychecks, there were 20,197 with shoe deductions, representing 6,466 employees, or approximately "65% of the employees in the sample" and 90 percent of the paychecks "issued during the time period" he reviewed; and (2) for 3,779 of those

---

[5] Plaintiffs submitted similar evidence in support of their opposition to Chipotle's motion to deny class certification, including excerpts from the Evans and Munoz depositions, the Edwards declaration, and evidence regarding plaintiffs' efforts to obtain discovery of Chipotle's written authorization forms and Chipotle's efforts to obtain plaintiffs' depositions.

8

paychecks, "the wages of the employees affected dropped below the applicable minimum wage" because of deductions taken for shoe purchases.

### *Chipotle's motion*

On February 1, 2013, Chipotle also filed its motion to deny certification and strike the class allegations. In support of its motion, as well as its opposition to plaintiffs' motion, Chipotle filed, among other evidence, the Spong and Evans declarations, 320 declarations from putative class members,[6] and deposition excerpts from plaintiffs' and Spong's depositions, among other deposition excerpts.

Spong represented that (1) employees were never required to purchase any shoes from Shoes for Crews or anyone else because they always had the option to wear free CrewGuard overshoes and were reminded of this free option in periodic discussions with their managers; (2) if employees chose to purchase shoes from Shoes for Crews, they could pay for the shoes via payroll deduction or pay directly with cash or another form of payment; (3) if they chose to purchase the shoes by payroll deduction, they always had to fill out a written authorization form, and the format of the form changed during the relevant time period; (4) the number of pay periods over which a payroll deduction could be taken varied during the relevant time period in response to "good business practices" learned from other companies that had similar programs; (5) in the "rare" instance in which a payroll deduction caused an employee's wages to fall below minimum wage for the pay period, Chipotle would "forego[] its right to take the deduction authorized by the employee"; (6) about 50 percent of California employees from August 2007 through December 31, 2012 "never had payroll deductions for [Shoes for Crews] shoes"; (7) in the last quarter of 2010, Chipotle provided an online option for purchasing shoes from Shoes for Crews, which Web site reminded employees that the free CrewGuards option was available, and required the employee to acknowledge that his or her purchase was voluntary; (8) he was not aware of any instance in which CrewGuards were not available in all sizes in every store for an employee who failed to wear slip-resistant shoes;

---

[6] Plaintiffs never deposed any of these declarants.

(9) Chipotle was not motivated by any impact the Shoes for Crews's warranty could have on workers' compensation expenses because the purpose of the program was "employee safety"; and (10) the appearance of Chipotle pay stubs varied over time "due to changes in the requirements of various state laws or to make pay stubs easier to understand and more user friendly." Attached to the Spong declaration were, among other items, exemplars of written payroll deduction authorization forms that Chipotle contends it "used throughout the life of the Shoes for Crews program."

Chipotle included excerpts from the Spong deposition, which repeated the representations Spong made in his declaration, including that "from day one" Chipotle obtained written authorization for payroll deductions for the Shoes for Crews program; and that the written authorization forms changed in format over time. Attached to the Spong deposition excerpts were sample authorization forms for the Shoes for Crews program.

The record includes Chipotle's summary of the 320 employee declarations accompanying its motion and opposition to plaintiffs' motion. We highlight aspects of that summary here. Given the variety of jobs and walking required for each job, employees had different shoe needs. The employees confirmed that free CrewGuards were always available in all sizes, and if they wished, they could purchase shoes through the Crews for Shoes program, although "Thousands" never did, instead, choosing the free overshoe option. They stated that they never were "pressured" to purchase shoes from the Shoes for Crews program, and that payroll deductions for any such purchases were taken only upon their written authorization. They further represented that some employees bought shoes through the program for friends and family and others bought slip-resistant shoes completely outside the program from other vendors. Finally, the employees represented that they believed their pay stubs to be accurate and did not suffer any injury because of information on or omitted from a pay stub.

As noted above, Munoz was the only named plaintiff asserting a minimum wage claim based on payroll deductions for the Shoes for Crews program. In her deposition, Munoz admitted not bringing 2010 pay stubs to the deposition because she thought they

10

were irrelevant even though she worked at Chipotle until September 9, 2010, and she kept them in a safe deposit box at home. She thus produced only three pay stubs at the deposition.

The record also reveals that discovery regarding the parties' respective motions was contentious as to the conduct of the Munoz deposition, including threats of violence and inappropriate language, Chipotle's efforts to set plaintiffs' depositions and plaintiffs' obstructing Chipotle's efforts to depose Dr. Fountain, and plaintiffs' unsuccessful effort to obtain discovery regarding Chipotle's assertion that it used payroll deduction authorization forms from the inception of the Shoes for Crews program.

Edwards testified at her deposition somewhat differently from the declaration submitted with plaintiffs' class certification motion. Instead of the Shoes for Crews program being required, she testified that if one could not afford to buy shoes, one could wear free overshoes provided by the company, which ran big; she conceded that the company would try to find overshoes that fit. She recounted on one occasion the company did not order a second pair of overshoes in her small size when another employee was wearing the only other pair of overshoes available in that size, but she was not sent home for not wearing overshoes, and never was sent home when there were no overshoes in her size. She added that if the company did not have "your size," you would "need to order shoes," although she also stated that she wore her manager's shoes when the company did not have overshoes available in her size. She further testified that she liked the overshoes because she then could wear any of her own shoes she would like.

Edwards confirmed that a pay period was two weeks. She testified that she never looked at the information on her wage statement except to bring the check to the bank, and that she never looked at the wage statement to see if it contained a beginning date for the pay period or whether the shoe deduction was accurate.

In his declaration, Evans responded to the Fountain declaration. He stated that the payroll records provided to Dr. Fountain reveal, contrary to Dr. Fountain's calculations, that approximately 50 percent of Chipotle employees did not have any payroll deductions

11

for the Shoes for Crews programs, and of the 233,536 (as opposed to Dr. Fountain's assertion of only 23,536) paychecks surveyed by Dr. Fountain, only 8.6 percent contained deductions for the latter program. Dr. Fountain submitted a supplemental declaration correcting his counting of the number of paychecks during the surveyed time period and agreeing that only 8.65 percent of those paychecks reflected Shoes for Crews deductions, but that his opinions otherwise remained the same.

### *The trial court's order denying class certification*

The trial court heard oral argument on April 17, 2013, and issued its order denying plaintiffs' class certification motion and granting Chipotle's motion to deny class certification on April 25, 2013. The trial court found that because individual inquiries were necessary to determine liability issues as to each of plaintiffs' proposed subclasses, common issues did not predominate and a class action was "an inferior method of resolving [plaintiffs'] claims on a class-wide basis." Accordingly, it granted Chipotle's motion and denied plaintiffs' motion.

Relying on *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, the trial court first described plaintiffs' burden in moving for class certification. Plaintiffs had to show more than that common issues exist, but instead, that the "common issues *predominate*. [Citation.] . . . '[T]his means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants."'" (*Lockheed*, at p. 1108.) Furthermore, to decide the predominance question, the trial court cited *Faulkinbury v. Boyd & Associates, Inc.*[7] and observed that "the court

---

[7] The Supreme Court granted review in *Faulkinbury* on October 13, 2010 (S184995). On June 20, 2012, the Supreme Court transferred the *Faulkinbury* case back to the appellate court with directions to vacate its decision and reconsider in light of *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*). On remand, the appellate court issued *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220.

must consider the plaintiff's legal theory of liability" to determine whether common issues predominate.

As to plaintiffs' assertion of a uniform failure to obtain written authorization for payroll deductions for the Shoes for Crews program prior to October 12, 2010, the trial court noted that Labor Code section 221 makes it "'unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee,'" and that Labor Code section 224 excepts "a deduction . . . expressly authorized in writing by the employee . . . not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining or pursuant to wage agreement . . . .'" The court further noted that plaintiffs had failed to allege violation of section 224 in the TAC, as well as plaintiffs' argument that they were not required to do so because section 224 is an exception to section 221.

Assuming for argument's sake that the latter contention was correct, the trial court found that plaintiffs had "failed to produce substantial evidence of a company-wide policy to take deductions without written authorization." In so finding, the court relied on two of Chipotle's principal legal authorities, *Brinker*, *supra*, 53 Cal.4th 1004, and *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341 (*Morgan*). The court acknowledged that under *Brinker*, if plaintiffs could demonstrate "a widespread policy precluding written authorization for the [Shoes for Crews program] deduction," classwide treatment of plaintiffs' Labor Code section 221 claims might be appropriate. Here, however, the evidence submitted by both sides did not establish such a "widespread policy" as a method of establishing liability, and absent such a uniform policy, under *Morgan*, "issues of whether each individual employee provided written authorization will predominate over any common issues."

The trial court observed that plaintiffs relied principally on Chipotle's initial interrogatory response and plaintiffs' own testimony that deductions were taken without their written authorization. The court also noted Chipotle's supplemental discovery response and Spong's testimony that at all times written authorization was required before payroll deductions could be taken for the Shoes for Crews program, and what the

13

court described as a copy of the authorization form that had been used between 2007 and the present, citing to exhibit S to the Spong declaration. The trial court also cited Spong's deposition testimony that employees signed a form acknowledging that their participation in the Shoes for Crews program was voluntary and that they authorized the corresponding payroll deduction. The court commented that the shoes could not be purchased without filling out a form because the form indicated the style, size, and color of the requested shoes.

The trial court rejected plaintiffs' contention that Chipotle's initial interrogatory response, indicating that in the beginning Chipotle required only verbal authorization for a Shoes for Crews payroll deduction, was sufficient under *Brinker* and *Morgan*: "The fact that [Chipotle] may have accepted verbal authorization for deductions from employees as stated in [its] interrogatory response does not establish that the uniform policy was <u>not</u> to obtain written authorization."[8] The court also found that the fact that Munoz and Edwards claimed that they did not give written authorization before amounts were deducted from their paycheck was "not sufficient to establish that their experiences are representative of the experiences of other employees," particularly in light of the declarations of several employees proffered by Chipotle stating that they gave prior written consent to take payroll deductions for the Shoes for Crews program. The court concluded: "[A]nswering the central question of whether written authorization was obtained requires individualized inquiries as to each employee's purchase of the Shoes for Crews shoes"—an inquiry requiring determining whether the employee completed the form or was informed that verbal consent was sufficient.

The court also noted that the evidence did not support a finding that the Shoes for Crews program benefited Chipotle solely: "There is ample evidence establishing that the program was for the benefit of the employees as well as the employer."

---

[8] At the hearing, in explaining Chipotle's initial interrogatory response, defense counsel conceded that Chipotle "did not focus as keenly as it should have" because "the deduction claim" under Labor Code section 224 was not in the case at the time Chipotle authored its initial response.

14

Regarding plaintiffs' claim under Labor Code section 2802 for failure to reimburse employees for shoes purchased through the Shoes for Crews program, the trial court observed that the central issue was "whether the employees were obligated to purchase Shoes for Crews shoes." The court found that there was "ample evidence that employees were given a choice of whether to wear the free shoe covers, or to purchase Shoes for Crews shoes," and that plaintiffs did not dispute that employees always had the option to wear free overshoes when they were available. The court stated that the Spong testimony and many employee declarations demonstrated that many employees did not participate in the Shoes for Crews program at all, and that those that did, did so voluntarily.

The court reasoned that to determine liability, the finder of fact would have to "look beyond the policy and make individual inquiries as to each employee's reason for purchasing the shoes." For example, the fact finder would have to determine for each employee whether (1) free overshoes were available at the employee's location; (2) the employee used slip-resistant shoes from a different vendor; and (3) the employee purchased shoes from Shoes for Crews solely for work at Chipotle or for personal uses. In sum, the court found that "individual issues are even more predominant as to this claim."[9]

The trial court found a failure of proof as to plaintiffs' assertion that common issues predominated as to their failure to pay minimum wage claim. The only evidence plaintiffs proffered was from Munoz herself and the Fountain declaration, which plaintiffs belatedly submitted with their reply brief.[10] As for the Munoz evidence, the

---

[9] At the hearing, in response to the trial court's observations that employees could always choose to wear free overshoes and thus were not required to purchase any slip-resistant shoes, plaintiffs' counsel conceded that "there is no way I can dispute the evidence about being able to avail themselves of free overshoes."

[10] We note that plaintiffs also included the Fountain declaration in their opposition to Chipotle's motion to deny class certification.

court found that plaintiffs submitted "no evidence whatsoever" that "other putative class members were affected similarly."[11]

The trial court gave little, if any weight to the Fountain declaration. The court found that his conclusion was based on using a disproportionately low number of paychecks, an error that made his mathematical calculations "on their face incorrect." The court dismissed Dr. Fountain's amended declaration describing the error as typographical: "Fountain signed a declaration under penalty of perjury that contained inaccurate computations" and it was "now" not clear who performed the calculations.[12]

The trial court also observed that Dr. Fountain did not explain his methodology or calculations and that where an expert "fails to explain the basis for his opinion . . . his opinion is of no value to the court." The court further observed that even if it were to consider the Fountain declaration, liability would require "individual inquiries" because if an employee voluntarily purchased shoes from Shoes for Crews—as opposed to being required to do so—the deduction would be a "'free and clear' advance to the employee," not a violation of minimum wage laws, and cited *Brennan v. Veterans Cleaning Service, Inc.* (5th Cir. 1973) 482 F.2d 1362 in support of its conclusion.

For all these reasons, the trial court found that common issues did not predominate as to this subclass. As an independent ground, the court found that plaintiffs failed to demonstrate typicality and numerosity.

The trial court also found that plaintiffs had failed to carry their burden to demonstrate that common issues predominated as to their noncompliant wage statement

[11] The trial court also observed that Edwards was not a class representative on this claim because the deduction did not cause her wage to fall below the minimum wage.

[12] At the hearing, plaintiffs' counsel admitted that the error was his when he copied and pasted an e-mail from Dr. Fountain into "the shell of the declaration," and Dr. Fountain signed the declaration thereafter. Plaintiffs' counsel also conceded that because of the latter error, Dr. Fountain's opinion in his signed declaration that Shoes for Crews deductions were taken on 90 percent of the surveyed paychecks was also incorrect, and the correct percentage should have been 9 percent. The trial court countered that it was "troubling" that Dr. Fountain "would have signed something under penalty of perjury without checking it for simple math errors."

subclass. The court noted the small number of wage statements plaintiffs proffered at all: three from Munoz, and two from Edwards that did not omit the beginning date of the pay period, which was the very basis of plaintiffs' claim. The court further found that the Evans testimony did not support plaintiffs' conclusion that "all wage statements for the putative class omit the beginning date of the pay period" because he said only that a wage statement unidentified in the deposition excerpt was "typical" of wage statements issued since 2009. This was all the more so given Edwards's own wage statements contradicted plaintiffs' claim that all wage statements did not contain a beginning date for the pay period. Where some wage statements supplied the "necessary information" and some did not, "individual inquiry will be required to determine what information is absent from each wage statement for each putative class member and whether the omission caused injury." As an independent ground, the court found that plaintiffs also failed to carry their burden to show ascertainability, numerosity, and typicality.

Finally, the trial court concluded that because plaintiffs conceded that "certifiability of the so-called derivative claims is dependent on certification of the foregoing claims, certification of these claims is also denied."

### *Post-motion proceedings*

Upon plaintiffs' request for clarification at a May 23, 2013 hearing, on May 24, 2013, the trial court issued a minute order nunc pro tunc clarifying the basis for its rulings and "'adopt[ing] and incorporat[ing] [Chipotle's] arguments supporting its conclusion that common issues do not predominate and that class litigation is not a superior means of resolving the instant action.'" The court also indicated that for these reasons, it was "'not necessary for the court to reach [Chipotle's] arguments as to alleged conflicts between the punitive [*sic*] class members or the adequacy of plaintiffs or their counsel.'" The court also struck that part of its order referring to plaintiffs' concession regarding the "'so-called derivative claim.'" Plaintiffs contend that this order "limits the scope of the issues on appeal, since the trial court did not reach many arguments raised by Chipotle, including arguments about the existence of a conflict of interest, adequacy of Plaintiffs as representatives and adequacy of class counsel."

17

On June 19, 2013, plaintiffs filed their notice of appeal in which they state that they are appealing from the trial court's denial of its class certification motion and granting of Chipotle's motion to deny class certification and of Chipotle's "objections to evidence."

In their opening brief on appeal, plaintiffs also seek review of the trial court's ruling on July 13, 2012, denying plaintiffs' motion to compel production of written wage authorization forms, as well as the trial court's failure to reconsider that order, albeit the record does not contain evidence of a motion to seek reconsideration under Code of Civil Procedure section 1008. We observe that plaintiffs' notice of appeal does not refer to the discovery order or a refusal to reconsider that order, although plaintiffs refer to the July 13, 2012 reporter's transcript "regarding Plaintiff Munoz's motion to compel further responses to special interrogatories and request for production" in designating the record on appeal. We also note that the record includes a minute order denying certain document requests because Chipotle had "sufficiently responded to these interrogatories and/or the requested information is irrelevant."

Plaintiffs' appeal initially was dismissed for lack of a case information form, but reinstated by this court on August 15, 2013. On October 29, 2013, the trial court stayed all plaintiffs' "individual claims" pending resolution of this appeal.

## DISCUSSION

It is well established under California law that an order denying a motion to certify all class claims leaving only the named plaintiff's individual claims in the trial court is an appealable order under the "'death knell'" doctrine. (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 757 (*Baycol*); *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 (*Daar*).) The rationale of permitting appeal of what would otherwise be an intermediate order is that absent immediate review, the plaintiff would have no financial incentive to pursue his or her case to final judgment just to preserve the ability to appeal the denial of the plaintiff's class certification motion. (*Baycol*, at p. 759 ["persistence of viable but perhaps de minimis individual plaintiff claims creates a risk no *formal* final judgment

18

will ever be entered"].)  Accordingly, denial of such a class certification motion is "'in legal effect a final judgment.'"  (*Ibid.* [quoting *Daar*, at p. 699].)

Indeed, where only the class representative's individual claims remain in the trial court, the failure to appeal from an order denying class certification of all class claims under the death knell doctrine generally precludes doing so at a later point.  "Because California allows direct appeals of death-knell orders, a plaintiff who fails to appeal from one loses forever the right to attack it.  The order becomes final and binding."  (*Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 811.)[13]

It is also equally well-established California law that the death knell doctrine does not apply to orders only partially certifying a class.  "In cases decided since *Daar*, we and the Courts of Appeal have emphasized that orders that only limit the scope of a class or the number of claims available to it are not similarly tantamount to dismissal and do not qualify for immediate appeal under the death knell doctrine; only an order that entirely terminates class claims is appealable."  (*Baycol*, *supra*, 51 Cal.4th at pp. 757–758.)

Similarly, in *Haro v. City of Rosemead* (2009) 174 Cal.App.4th 1067 (*Haro*), Division Eight of this appellate district declined to apply the death knell doctrine to review an order denying class certification in an action brought under the Fair Labor Standards Act of 1938 (FLSA; 29 U.S.C. § 201 et seq.), asserting violations of the minimum wage/maximum hour laws.  The appellate court first observed that actions under the FLSA are not properly classified as class actions under federal or California class action rules because, among other reasons, the FLSA requires employees affirmatively to opt into the FLSA proceeding to be bound by, or benefit from that

---

[13] In *Baycol*, *supra*, 51 Cal.4th 751, the Supreme Court recognized that such a rule of preclusion is not compelled in all circumstances, for example, in the case before it.  As discussed more fully *post*, there, the plaintiff failed to take an appeal from the trial court's order sustaining a demurrer to the class and substantive allegations without leave to amend, but waited to appeal until a judgment of dismissal was entered after the trial court denied the plaintiff's motion for reconsideration.  The Supreme Court rejected the defendant's argument that because an order denying class certification was immediately appealable under the death knell doctrine, the plaintiff's appeal was untimely.  (*Baycol*, at p. 762.)

proceeding. In contrast, federal and state class action rules generally provide that class members must opt out in order not to be bound by a judgment in the class action proceeding. (*Haro*, at pp. 1071–1072.)

The appellate court then rejected the plaintiff's argument that the trial court's denial of class certification was an appealable order because denial of class certification "[did] not produce a terminal result . . . . Specifically, there is nothing to prevent this action going forward as an opt-in, collective FLSA action. . . . [T]here is no question that this FLSA action as it is presently constituted can go forward to trial." (*Haro*, *supra*, 174 Cal.App.4th at p. 1078.)

Chipotle argues that survival of the PAGA claims here precludes applying the death knell doctrine because plaintiffs "seek penalties under PAGA not only on their own behalf, but also on behalf of 'other current and former employees'—all of whom are members of the putative class for which certification was denied." Chipotle reasons that because of the potential for an award of the PAGA's penalties, plaintiffs still have incentive "to push forward with the litigation notwithstanding the denial of class certification." Chipotle relies on the *Daar* and *Baycol* cases for this proposition.

Plaintiffs retort in their reply brief on appeal that only Munoz has asserted a PAGA claim and that even under Chipotle's rationale, the death knell doctrine should apply to make the trial court's order as to Edwards's class claims appealable. We observe that plaintiffs cite no authority for this contention. For the reasons set forth more fully below, plaintiffs' argument also appears counterintuitive given that Edwards, as a "former employee," could still benefit from a successful prosecution of the PAGA claims in the TAC, in addition to whatever recovery she may have on her individual non-PAGA claims. (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986–987 (*Arias*).)

Plaintiffs also argue that the Supreme Court expressly recognized in *Arias* that PAGA claims are not, as Chipotle argues, "tantamount to a claim on behalf of a class" when the high court held in *Arias* that while a plaintiff may choose to bring PAGA claims as a class action, a PAGA claimant need not do so. Finally, relying on *Olson v. Cory*

20

(1983) 35 Cal.3d 390, plaintiffs request that we treat their appeal as a writ if we conclude that the trial court's order denying certification was not an appealable order.[14]

We have not found any reported case, and the parties have not cited any, that addresses the precise issue before us: Whether the presence of PAGA claims following a trial court's denial of class certification precludes application of the death knell doctrine? For the reasons set forth below, we conclude that it does here, and that plaintiffs' appeal must be dismissed.

When a plaintiff seeks civil penalties under the PAGA, he or she is not doing so as an individual, but instead as a representative of the state, and on behalf of similarly "aggrieved" employees.[15] "An employee plaintiff suing, as here, under the Labor Code Private Attorneys General Act of 2004, does so as the proxy or agent of the state's labor law enforcement agencies. The act's declared purpose is to supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves. (Stats. 2003, ch. 906, § 1 [Legislature's findings and declarations].) In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies—namely, recovery of civil penalties that otherwise would have been assessed and collected by the Labor Workforce Development Agency." (*Arias*, *supra*, 46 Cal.4th at p. 986.) Indeed, plaintiffs' counsel represented at the May 23, 2013 trial setting conference that plaintiffs "have PAGA claims. It wouldn't be just an individual trial."

Pursuant to Labor Code section 2699.3, civil penalties under the PAGA are available for violations of those Labor Code sections set forth in Labor Code section 2699.5, assuming the PAGA plaintiff has complied with the procedures set forth in Labor

---

[14] Plaintiffs assert that the death knell doctrine would also make the trial court's discovery order regarding Chipotle's written authorization forms appealable. We have reservations as to whether we may even address that contention given plaintiffs' failure to list that order in their notice of appeal. Given our disposition, however, the issue is moot.

[15] The PAGA defines an "'aggrieved employee'" as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (Lab. Code, § 2699, subd. (c).)

21

Code section 2699.3.[16]  All of plaintiffs' causes of action in the TAC under the Labor Code are for sections listed in section 2699.5.

Generally speaking, the civil penalties available under the PAGA are $100 "for each aggrieved employee per pay period for the initial violation and [$200] for each aggrieved employee per pay period for each subsequent violation."  (Lab. Code, § 2699, subd. (f)(2).)  Seventy-five percent of penalties "recovered by aggrieved employees" must be distributed to the "Labor and Workforce Development Agency for enforcement of labor laws and education of employers and employees about their rights," with the remaining 25 percent to be distributed to the "aggrieved employees."  (Lab. Code, § 2699, subd. (i).)  A prevailing PAGA plaintiff may recover his or her attorney fees and costs as well.  (Lab. Code, § 2699, subd. (g)(1).)  Thus, where, as here, the purported violator has had many employees with earnings over many pay periods, the recovery could be quite substantial.

Given the potential for recovery of significant civil penalties if the PAGA claims are successful, as well as attorney fees and costs, plaintiffs have ample financial incentive to pursue the remaining representative claims under the PAGA and, thereafter, pursue their appeal from the trial court's order denying class certification.  Denial of class certification where the PAGA claims remain in the trial court would not have the "legal effect" of a final judgment under the reasoning of *Baycol*[17] and *Daar*.[18]

---

[16] Chipotle has not asserted any failure to do so here.

[17] In *Baycol*, the plaintiff sued a drug manufacturer under unfair competition and consumer remedies statutes.  The trial court had sustained a demurrer without leave to amend as to the class and individual claims.  As noted earlier in this opinion, the issue in that case was whether the plaintiff's appeal was timely when the plaintiff did not appeal from the order sustaining the latter demurrer, but waited until judgment was entered after the plaintiff's reconsideration motion was denied.  The court held that the death knell doctrine did not apply at all because the demurrer ruling encompassed the plaintiff's class and individual claims, and unlike in *Daar*, there was no risk that "an individual plaintiff may lack incentive to pursue his individual claims to judgment, thereby foreclosing any possible appellate review of class issues[.]"  (*Baycol*, *supra*, 51 Cal.4th at p. 758.)

Instead, we see this case as similar to *Haro*, *supra*, 174 Cal.App.4th 1067, where the inability to proceed as a class action did not sound the death knell of the plaintiff's claim when the plaintiff still had financial incentive to proceed under the FLSA. *Farwell v. Sunset Mesa Property Owners Assn., Inc.* (2008) 163 Cal.App.4th 1545 is also instructive. There, the trial court sustained a demurrer to plaintiffs-appellants' allegation of a defendant class with leave to amend for lack of a proper class representative. The appellants argued that the trial court's comments doubting their ability to amend sounded the death knell for their allegation of a defendant class, and that all the homeowners potentially would have to be brought in as defendants. Division Eight of this appellate district refused to apply the death knell doctrine and dismissed the appeal. "[T]he gist of the death knell doctrine is that the denial of class action certification is the *death knell of the action itself*, i.e., that without a class, there will not be an action or actions, as is true of cases when the individual plaintiff's recovery is too small to justify pursuing the action. In this case, as inconvenient as separate individual actions against homeowners may be both for plaintiffs and defendants, such actions can nevertheless be filed and pursued. Thus, this is not an appropriate case for the death knell doctrine." (*Farwell*, at p. 1552.)

We recognize that on occasion we may treat a premature appeal as a writ. (*Olson v. Cory*, *supra*, 35 Cal.3d 390.) The Supreme Court counseled in *Olson* that the power to treat a "purported appeal as a petition for writ of mandate" should be exercised only "under unusual circumstances." (*Olson*, at p. 401.) We do not perceive any such "unusual circumstances" here.

---

**18** In *Daar*, the plaintiff challenged certain alleged taxicab overcharges. The trial court had sustained a demurrer to the plaintiff's class claims without leave to amend and transferred the plaintiff's individual claims to municipal court because it concluded that the individual claims could not satisfy the jurisdictional amount requirement for superior court. The Supreme Court described the effect of these rulings as "tantamount to a dismissal of the action as to all members of the class other than plaintiff." (*Daar*, *supra*, 67 Cal.2d at p. 699.)

**DISPOSITION**

Plaintiffs' appeal is dismissed. We express no opinion on the merits of the trial court's order denying plaintiffs' class certification motion and granting defendant's motion to deny class certification, or the court's evidentiary rulings related to those motions. Defendant is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION.


                                                        BENDIX, J.*

We concur:


        ROTHSCHILD, P. J.


        CHANEY, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.