Filed 2/7/23  Alcaraz v. DMW Industries CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RAUL ALCARAZ et al., | F082417 |
| Plaintiffs and Appellants, | (Super. Ct. No. BCV-15-100055) |
| v. | |
| DMW INDUSTRIES, INC., | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett, Judge.

Justice Law Corporation, Douglas Han, Shunt Tatavos-Gharajeh, and Talia Lux for Plaintiffs and Appellants.

Belden Blaine Raytis, T. Scott Belden, and Kaleb L. Judy; Hodges Law Group and Nathan M. Hodges for Defendant and Respondent.

-ooOoo-

**INTRODUCTION**

Plaintiffs/appellants Raul Alcaraz and Robert Mann[1] (collectively, "plaintiffs") appeal from an order of the Kern County Superior Court denying plaintiffs' motion for class certification in connection with various class action claims asserted against plaintiffs' former employer, defendant/respondent DMW Industries, Inc. (DMW). We affirm in part, reverse in part, and remand for further proceedings.

**PREFACE**

In the following opinion, we conclude, among other things, that certain class claims at issue present predominant common questions of law and fact with regard to liability whereas others do not. In doing so, however, we wish to clearly state that our opinion should not be construed as directing the trial court to certify the class for each, or any, of those class claims. Rather, we remand to the trial court to continue its analysis of the remaining considerations relevant to class certification.

We also note that, in denying class certification for the claims we identify herein as presenting predominant common questions of law and fact (the rest and meal break claims and steel-toe boot reimbursement claims), the trial court identified *numerous considerations that will remain relevant to the rest and meal break claims once the court resumes its analysis* and which the court will need to consider anew. However, as discussed herein, we view those considerations as relating primarily to the *manageability* of individual issues related to damages, rather than whether common questions of law

---

[1] The notice of appeal filed in this matter only identifies plaintiff Raul Alcaraz as "Plaintiff/Petitioner." (Some capitalization omitted.) However, the original briefing in this matter identified both Mann and Alcaraz as appellants. At oral argument, plaintiffs' counsel advised that, after briefing in this matter was completed, plaintiffs' counsel lost all contact with Mann and that the appeal "at this juncture" should be considered as being brought by Alcaraz. Based on this concession, we acknowledge Mann has abandoned the appeal. Notwithstanding, because this concession appears to be premised on facts that occurred after appellate briefing was completed, we continue to refer to appellants using the plural term "plaintiffs."

2.

and fact predominate as to liability issues. Because "we analyze the propriety of an order denying class certification based solely on the lower court's stated reason for [its] decision" and "ignore any other grounds which might support denial" (*Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213, 1223–1224), we are precluded from ruling on the manageability of individual issues independent of the trial court. The trial court is best positioned to make such judgment calls.

Finally, we wish to acknowledge the relatively unusual nature of DMW employee field work. Without making any findings or pronouncements in that regard, we acknowledge issues pertaining to class certification may be complicated by the nature of their work. Again, the trial court is best positioned to assess these issues and their significance with regard to class certification.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are former employees of DMW, an oilfield welding services operation headquartered in Bakersfield, California.

## I. THE PLEADINGS

On May 14, 2015, Alcaraz filed a class action complaint against DMW and Does 1 through 50 alleging various causes of action for Labor Code violations, and unfair and unlawful business practices under Business and Professions Code section 17200 (section 17200 claim). The complaint also included a cause of action under the Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.).[2] On July 15, 2015, DMW demurred to the complaint in lieu of filing an answer.

On September 18, 2015, plaintiffs filed a first amended class action complaint alleging the same or similar causes of action. It was at that time that Mann, also a former employee of DMW, was first joined as a named plaintiff in the case.

---

[2] All subsequent statutory references are to the Labor Code unless stated otherwise.

On November 18, 2015, upon the parties' stipulation, the trial court granted plaintiffs leave to file a second amended complaint which was filed that same day. The recitals in the parties' stipulation indicate they had reached an agreement the amendments would "reflect that . . . Alcaraz is bringing the sixth cause of action for PAGA, and that . . . Mann is bringing the class claims . . . ."

The complaint was amended several times thereafter culminating in plaintiffs' fifth amended class action complaint (governing complaint) filed on November 20, 2018. As with the preceding versions, the fifth amended complaint alleged the same or similar causes of action as the initial complaint.

On December 26, 2018, DMW answered the governing complaint. It generally denied plaintiffs' claims and alleged 26 affirmative defenses.

On June 25, 2020, plaintiffs filed a motion for class certification. On December 4, 2020, the trial court issued its ruling to deny plaintiffs' motion. The order adopting the court's ruling was entered on January 14, 2021, and notice of its entry was given on February 1, 2021. (We refer to the order and the ruling upon which it was based as the "subject order.")

On February 16, 2021, upon the request of Alcaraz, the clerk of court dismissed Alcaraz's PAGA claim without prejudice.

On February 18, 2021, plaintiffs timely appealed the subject order.[3]

## II.    FACTUAL ALLEGATIONS IN THE GOVERNING COMPLAINT

The following allegations are contained in the governing complaint.

Alcaraz was employed by DMW from September 2013 to March 2015, as "an hourly-paid, non-exempt employee" in various capacities including as a "driver, a 'trailer', and a fire watchperson." His duties in these roles included "driving hauls back and forth between locations, prepar[ing] and inspect[ing] trucks, gather[ing] and

---

[3] See footnote 1, *ante*.

4.

inspect[ing] equipment and tools, load[ing] and unload[ing] trailers, conduct[ing] fire watch duties for [d]efendant's welding department, and monitor[ing] for possible fires and safety issues."

Mann was employed by defendants from June 2011 to December 2013, as "an hourly-paid, non-exempt employee" in various capacities including as a "driver, welder, and general welder." His duties in these roles included "perform[ing] field welding and shop welding, [driving] and operat[ing] trucks, prepar[ing] and inspect[ing] trucks, and perform[ing] general labor."

### A. First Cause of Action Regarding Meal Period and Rest Period Wages

In the first cause of action, Mann alleges that he, the class, and affected subclass members "had the right to take a 10-minute rest break for every four (4) hours worked or major fraction thereof, and a 30-minute meal period for every five (5) hours worked"; and that DMW "as a pattern and practice, . . . would regularly require . . . Mann and other employees to work shifts exceeding 10 hours and did not provide [them] with meal periods and rest breaks according to the time periods outlined in . . . [sections] 226.7, [and] 512, [or] provide proper compensation for this failure . . . ."

Mann alleges DMW instructed its employees "to record that they took meal and rest periods" even when they did not, and when they were "provided with meal and rest periods, [employees] would regularly be rushed, pressed to cut-short [*sic*] or interrupted and were not paid the proper [wage] premiums for these violations." Mann also alleges DMW failed to provide employees with required cool-down rest periods to protect them against heat illness and did not compensate them for these violations.

### B. Second Cause of Action Regarding Overtime Wages

In the second cause of action, Mann alleges that DMW "was required to compensate [its] non-exempt employees minimum wages for all hours worked and overtime wages for all hours worked in excess of eight (8) hours in a day or forty (40) hours in a workweek"; and that "as a pattern and practice . . . DMW . . . regularly

required . . . Mann and other employees to work in excess" of those amounts, "regularly miscalculated overtime compensation by failing to pay daily overtime after eight hours per day," and would only compensate its employees for time billed to DMW's clients rather than for actual time worked. He alleges DMW engaged in a pattern and practice of "requiring employees to arrive earlier than their shift to perform pre-shift work" without compensation and to "remain 'on-call' with a restrictive response time, which required . . . [employees] to remain within a short distance from [DMW's] yard." He alleges DMW failed to compensate its employees for "time spent performing pre-shift work" and "for remaining on-call and for responding to on-call time." Mann contends these patterns and practices violated sections 510 and 1194.

### C.    Third Cause of Action Regarding Waiting Time Penalties

In the third cause of action, Mann alleges DMW "was required to pay its employees all wages owed in a timely fashion at the end of employment pursuant to . . . [sections] 201 to 204" and, as a result of these violations, DMW "regularly failed to pay [them] their final wages . . . and accordingly owe waiting time penalties pursuant to . . . [section] 203." These claims are alleged to be derivative of those alleged in the first and second causes of action.

### D.    Fourth Cause of Action Regarding Record Keeping

In the fourth cause of action, Mann alleges DMW "failed . . . to keep *accurate* records regarding the rates of pay for their California employees." The claim is derivative of those alleged in the first and second causes of action. Mann contends the practice violates subdivision (a) of section 226 entitling him and other class members to damages and/or penalties, interest thereon, reasonable attorney's fees, and costs of suit.

### E.    Fifth Cause of Action Regarding Business Expenses

In the fifth cause of action, Mann alleges that DMW "was required to indemnify [its] employees for all necessary expenditures or losses incurred in direct consequence of the discharge of [their] duties, or of [their] obedience to the directions of [DMW]

6.

pursuant to . . . [section] 2802"; and that DMW violated said statute by requiring its employees "to purchase and provide their own safety equipment including, but not limited to steel toe boots, travel reimbursement to off-site training sessions, mileage reimbursement for responding to on-call schedule, laundering [their] own uniforms, and mileage for out-of-town travel." Mann contends the practice violates section 2802 and entitles him and other class members to damages and/or penalties, interest thereon, reasonable attorney's fees, and costs of suit.

### F. Sixth Cause of Action (PAGA claim)

The sixth cause of action is a PAGA claim brought by Alcaraz. This claim is not at issue on appeal.

### G. Seventh Cause of Action (section 17200 claim)

In the seventh cause of action, Mann alleges the previously alleged violations "constitute[] unfair, unlawful competition and provides an unfair advantage over [DMW's] competitors" in violation of Business and Professions Code section 17200 et seq., and entitles him and other class members to "full restitution of monies . . . to restore any and all monies withheld, acquired and/or converted by [DMW] by means of" said practices.

## III. CLASS CERTIFICATION PROCEEDINGS

On January 23, 2017, the trial court issued a Joint Case Management Order [*sic*] and Order (boldface & some capitalization omitted) (case management order) adopting the parties' Joint Case Management Statement. The case management order noted the "parties engaged in a *Belair*[4] opt-out procedure in order for [p]laintiffs to be able to obtain class contact information," and the parties' agreement that a class certification motion should be delayed due to settlement discussions.

---

**4** *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554 (*Belaire*).

On June 25, 2020, plaintiffs filed a motion to certify proposed class and subclasses for the class action claims. Specifically, plaintiffs sought an order certifying a class described as follows: "all current and former California-based hourly-paid or non-exempt field employees who worked for [DMW] at any time during the period from May 14, 2011 to class certification" (overarching class). In addition, plaintiffs sought certification of the following subclasses:

> "(a) Meal Period Subclass: all Defendant's non-exempt employees who worked one or more shifts in excess of six (6) hours in California who were not provided a 30-minute break during which they were relieved of all duties, during the period from May 14, 2011 to the present;

> "(b) Alternative Meal Period Subclass: all Defendant['s] non-exempt employees who worked one or more shifts in excess of twelve (12) hours in California who were not provided a 30-minute break during which they were relieved of all duties, during the period from May 14, 2011 to the present[5];

> "(c) Rest Break Subclass: all Defendant['s] non-exempt employees who worked one or more shifts of three and one-half (3.5) hours or more in California who were not provided a 10-minute break during which they were relieved of all duties, during the period from May 14, 2011 to the present;

> "(d) Overtime Subclass: all Defendant['s] non-exempt employees who worked in excess of eight (8) hours in a day or forty (40) hours in a week, during the period from May 14, 2011 to the present;

> "(e) Minimum Wage Subclass: all Defendant['s] non-exempt employees who worked in California and were not properly paid all minimum wages during the period from May 14, 2011 to the present[;]

> "(f) Business Expense Reimbursement Subclass: all Defendant['s] non-exempt employees who worked in

---

**5** For purposes of this opinion, we consider and treat the meal period and alternative meal period subclasses and claims collectively.

California and incurred business expenses that were not reimbursed during the period from May 14, 2011 to the present."

## A.     *Plaintiffs' Evidence in Support of the Class Certification Motion*

In support of the motion, plaintiffs' attorney, Daniel J. Park, filed a declaration outlining, among other things, his qualifications as an attorney and his experience in handling class action cases and representative PAGA matters. He also averred "[i]n or around March, 2016, Simpluris Inc., the third party administrator selected by the parties to administer the *Belaire* process, sent notices to the 155 class members on the class list Defendant provided Simpluris." In addition, he authenticated declarations obtained from several putative class members, excerpts from the deposition of David Martin Miller (i.e., DMW's principal),[6] documents produced by DMW in discovery including DMW's "Company Policy Handbook—II Edition" (2011 handbook); DMW's "Employee Handbook—DMW Industries, Inc.—Revised August 2014" (2014 handbook); and "weekly pay records with corresponding handwritten time sheets, job completion forms, and job and time summaries for the week of work . . . ."

### 1. Former DMW Employee Declarations—Putative Class Members

In support of their class certification motion, plaintiffs offered the declarations of four former DMW employees, Salvador Castillo, Carlos Gomez, Nicholas Beavers, and Michael O'Neill. Except for minor variations and occasional facts specific to each declarant's job or experience, the declarations are largely identical. The substance of those declarations is set forth below.

Each of the declarants worked "predominantly in the field on wells and rigs on oil leases in Kern County." Castillo worked for DMW "in or about 2015 to 2016" as a "fire

---

[6] Miller was substituted in as a defendant for defendant Doe 1 on May 13, 2016, in connection with the PAGA cause of action only. The record reveals Miller demurred to the PAGA cause of action on December 26, 2018, and that he was removed as a defendant on December 10, 2019. As mentioned, the PAGA cause of action was dismissed without prejudice prior to the appeal.

9.

watch, welder helper, welder and tool mover."[7]  Gomez worked for DMW "in or about 2009 to December 2015" as a "fire watch, welder helper, welder and tool mover." Beavers worked for DMW "in or about 2012 to 2015" as a "welder's helper and lead man."  O'Neill worked for DMW "from about November, 2013 to April, 2015" as a "fire watch, a hydro testing hand, and hydro tester."

Each declarant averred he "never received payment of a meal break premium or rest break premium" and was "not told what these were by DMW."  None of the declarants worked a "set weekly schedule."

Each declarant stated, "DMW routinely failed to provide [him] with 30-minute or 60-minute off-duty meal breaks and 10-minute off-duty rest breaks.  The workload was heavy and the nature of the work would not allow [him] to take a meal or rest break." The declarants explained that when a welder begins to weld, workers cannot take breaks because it will "jeopardize the final product" and "potentially ruin a well head."  "Taking breaks during the welding process would also result in excessive billing and inefficient use of time, as stopping the process and reheating the metal to get it to the right temperature would waste time."  The employees had to constantly monitor the welding process and the client's "man on-site monitored" the workers.

There would be occasions for "downtime"—"typically available only when we were in between jobs or arrived at a job site" when, for example, cement was being poured.  "Therefore, DMW had no official meal and rest break policy . . . other than instructions from DMW's dispatch to eat something along the way to the next job site or if downtime allowed."  They were not permitted to leave the jobsite during downtime because they "had to be present and ready to immediately resume work when welding was required."  The only time they were permitted to leave for a break was when the

_____

[7] Castillo would later admit at deposition he did not work as a welder while employed at DMW.

client's company man on-site specifically authorized it, which was rare. If they worked more than 10 hours in a shift, they were "never provided . . . a second 30-minute off-duty meal break" and were never paid for breaks they were not allowed to take.

Their work hours would be communicated to them on their personal cell phones from DMW's dispatch. They were required to respond "within 30 to 45 minutes"—even on days off. Dispatch would instruct them to "report to DMW's yard . . . at a specified time, usually within one (1) hour" for eventual dispatch to an off-site job. Before their day was through, they would "regularly receive[] another call or text from dispatch on [their] personal cell phone with information" for the next job or were expected to call dispatch to see if there was another job to report to.

When off work but "on-call," if the declarants did not respond to dispatch within the required time, they would be reprimanded. If they did not respond at all, their hours would be cut "so that [they] would be starved out of work." "Based on [their] observations and conversations with supervisors and dispatch," if an employee did not take the call, declined work, or failed to respond, those employees "were starved out and eventually fired." According to some, this was per "instructions by . . . Miller." Castillo averred he was personally instructed by Miller "not to travel anywhere that exceeds a thirty (30) minute drive while on-call" and that he was required to notify dispatch if he had to travel while on call. On one occasion Castillo was verbally reprimanded when he could not work due to childcare responsibilities and was told by Miller he "had to be available to work at all times." The declarants were "never compensated for time spent on-call."

Each declarant averred he "regularly worked shifts longer than twelve (12) hours" and would frequently work "consecutive days for a total of 70 to 80 hours during a week." Each declarant stated, "with DMW's timekeeping, a shift's hours [were] reset overnight at midnight so that even if I worked through the night, a new day's shift started

11.

while [he] was on the clock." The declarants do not explain the relevance of this contention or how it impacted them.

The declarants were required to record the hours they worked on timecards to be turned in to DMW's payroll department but were not allowed to record all the actual hours they worked. They were instructed on the number of hours to record by DMW dispatch and payroll based on what the welder on the job recorded. They were never compensated for the full amount of time necessary to "perform preparatory work" such as the time it took them to don personal protective equipment (i.e., "steel-toed boots, hardhats, glasses, gloves, and fire retardant clothing"), to "gather[] tools," and "conduct[] a pre-shift vehicle inspection." O'Neill stated he was "instructed by payroll to round the time down to the nearest 30-minute interval instead of the time [he] arrived at the yard. . . . [E]verything was rounded to the nearest 30 minutes."

DMW payroll required the declarants to report that they took "meal breaks after every fifth hour when [they] worked in the field" even though they did not receive a break. They were instructed that they would not get paid unless they reported meal breaks as instructed. In a supplemental declaration, Castillo also averred he was required to attend weekly safety meetings but was instructed by Miller not to record the time he spent in those meetings.

DMW withheld the declarants' paychecks if they failed to provide payroll with "job tickets"—documents provided to them by the DMW client for whom they were performing work which reflected the "number of hours that were charged for the job." The DMW welders would complete the job tickets and the declarants would copy the information onto their timecards. The declarants were required to conduct job safety analyses prior to entering a jobsite and throughout their work on the site and, at the end of their shift, were required to complete related paperwork. They were not compensated for performing this paperwork.

12.

DMW required declarants to wear personal protective equipment such as fire-retardant clothing and steel-toe boots which they purchased for themselves. They were never reimbursed for all such purchases or for company-related cell phone usage.

The declarants averred that when their respective employments were terminated, DMW failed to pay them the wages they were owed, including for "off-the-clock work . . . and meal and rest premiums" and has still failed to pay those wages.

### 2. Declaration of Plaintiff Raul Alcaraz

Alcaraz stated he worked "one or more shifts over three and a half hours in length," "one or more shifts between six and eight hours in length," and "one or more shifts greater than ten hours in length," and "never received payment of a meal break premium or rest break premium." His declaration is largely identical to declarations of Castillo, Gomez, Beavers, and O'Neill, except he also discusses his suitability as a class representative—notwithstanding the fact all class claims, by stipulation, were brought by Mann. Alcaraz stated he knows he has the following duties: "a. Represent the interests of all members of the Class; [¶] b. Always consider the interests of the Class just as I would consider my own interests, and put the interests of the Class before my own interests[; ¶] c. This means that I am a fiduciary of the Class that I understand to mean I cannot 'sell out' the Class for my own personal gain; [¶] d. Always actively participate in the lawsuit by, amongst other things, searching for documents, keeping in contact with my attorneys and answering their questions as needed—which I believe I have done so far; . . . [¶] e. Follow the progress of the lawsuit and provide all relevant facts to my attorneys[; and ¶] f. In short, I understand I am pursuing claims on behalf of people that may not want to or may be unable to file their own lawsuits." He continued, "I have spent a substantial amount of time on this litigation. Among other things, I searched for documents as part of my duty as a plaintiff, I consult with my attorneys on a regular basis, and I assisted my attorneys in preparing this declaration."

### 3. DMW Policy Handbooks and Pay-related Records

Plaintiffs submitted portions of DMW's 2011 handbook and 2014 handbook and provided time sheets, job completion forms and pay records they contend constitute "prima facie evidence of a uniform practice applicable to all class members." The trial court sustained DMW's objections to the time sheets, job completion forms and pay records.[8] On appeal, plaintiffs do not challenge the trial court's ruling on DMW's objections.

### 4. Deposition of Miller

Miller was deposed in his individual capacity and as the "PMK on behalf of DMW . . . ."[9] (Some capitalization omitted.) He testified DMW "employees are paid from the time they get to the yard to the time they leave." He confirmed DMW does not pay its employees for "on-call" time. He confirmed DMW's policy "in 2011 through 2014" was that " 'when working conditions permit impending [*sic*] a supervisor's approval, employees are entitled to one ten-minute break for every four hours worked.' " He noted that DMW's policy is, as reflected in the 2011 handbook, employees "will get their break . . . anywhere from two hours to four hours" and that "they have to work around the specific job that they're on. And that's why it says supervisor's approval." The 2011 handbook reads, in relevant part: "[w]hen working conditions permit, and pending a supervisor's approval, employees are entitled to one 10 minute break for every 4 hours worked." The 2011 handbook also reads, in part: "Meal periods are for 60 minutes, and specific times must be approved by a supervisor." However, Miller testified

---

[8] DMW objected on grounds of hearsay, lack of foundation, lack of authentication, and lack of personal knowledge.

[9] PMK commonly refers to the "person most knowledgeable" or "person most qualified" to testify at deposition on behalf of an entity as to specified matters. (Code Civ. Proc., § 2025.230.)

this provision applied only to office employees. Employees working in the field received 30-minute meal breaks.

### B. DMW's Evidence in Opposition to the Class Certification Motion

### 1. Deposition Testimony of Plaintiffs' Declarants

DMW submitted excerpts from the deposition testimony of declarants Castillo, Gomez, Beavers, O'Neill, and Alcaraz in opposition to plaintiffs' class certification motion.

#### a. Castillo Deposition

Castillo testified that welding a "starter head" would typically take two to four hours. At the end of every job, he would turn in "rig tickets" which reflected the number of hours worked on a specific job. If a job took an hour or two, DMW still charged a minimum of four hours for the job but the employee only got paid for the hour or two worked. Castillo completed his timecards daily and turned them in weekly. If he did not put a lunch time hour or when he took breaks on his timecard, he would be called to the office to fill in the missing time.

Castillo acknowledged receiving a boot voucher from a particular store to obtain work boots but they never had his size. As a result, he purchased other work boots with his own money.

#### b. Gomez Deposition

Gomez testified his typical crew size was seven people but could be as few as two persons counting himself. Two-person jobs typically took two to three hours to complete. On a four-job stint, which the company charged for 16 hours, Gomez would probably work 12 hours. The remainder of his time was spent driving.

Although he logged meal periods on his timecards, Gomez never received a lunch break when out in the field during his six years of employment at DMW. He was informed by DMW personnel that he would not get paid unless he wrote those meal periods on his timecards. He testified he was paid "from the moment [they] entered until

15.

the moment [they] got out, but [they] also started before that to prep what [they] needed to prep." They were not paid for that prep time. Similarly, they were not paid for time spent on the job unloading once they returned to the yard.

Gomez acknowledged receiving an allowance for boots "maybe three, four times."

### c. Beavers Deposition

Beavers testified that at times he was compensated by DMW starting from the moment he arrived at the DMW yard and that, at other times, he was only compensated starting from the time he left the DMW yard to go to a jobsite. In the latter case, he would not be compensated for preparing to leave for the jobsite—i.e., "getting stuff ready, wellheads, leads, welding rods for the welder, [and] stuff like that." He estimated the latter case occurred anywhere from 50 percent to 60 percent of the time. He did not typically get paid for work that occurred after he returned to the yard—e.g., setting up for an upcoming job. He estimated he did not get paid for such time after returning from a jobsite approximately 60 percent of the time.

Beavers testified he did receive a boot voucher one time during his employment with DMW.

### d. O'Neill Deposition

O'Neill testified he was paid from the time he showed up at the DMW yard to the time he left the yard and that he was, in fact, compensated for work performed at the yard including prep work.

### e. Alcaraz Deposition

Alcaraz testified he started looking for an attorney to represent him in connection with his grievances against DMW after DMW began reducing his hours. He had to apply for unemployment insurance because he was unable to get 40 hours of work. He speculated he "got on one of the supervisor's bad side or dispatch's bad side" and that DMW was starting to "starve [him] out." He believes he was wrongfully terminated, "personally being victimized," and "targeted."

16.

Alcaraz never complained to DMW office personnel about DMW's compensation practices. He indicated it was the general complaint of his coworkers that "if you rocked the boat over there, they are going to get rid of you." However, he was unable to name anyone in particular who had been let go because they "rocked the boat."

If he had a "scheduled" day off, he could still be called to work, but could decline going to work. If he was scheduled to work and declined, he indicated "they will starve you out."

He confirmed receiving a $200 voucher for steel-toe safety boots on a single occasion. However, all the boots were more than $200, so he had to come up with the remainder out of his own pocket. He had to buy at least four pairs of boots using his own money.

Alcaraz confirmed his signature on an "Arbitration Agreement/Acknowledgment." (Boldface omitted.) He did not recall signing the arbitration agreement or having it explained to him but believes he was forced to sign it in order to pick up his paycheck because "[t]hat's how they usually did it" when they needed an employee to sign a document. The arbitration agreement, signed by Alcaraz on August 13, 2014, reads, in part:

> "**[T]here will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective or representative action. ('Class Action Waiver')**. Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Agreement in any case in which the dispute to be arbitrated is brought as a class, collective or representative action. . . . Notwithstanding any other clause contained in this Agreement, any claim that all or part of the Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator."

At the time of his deposition, Alcaraz indicated he had not spoken with his coplaintiff, Mann, for about a year.

## 2. DMW's Declarations of Current and Former DMW Employees

### a. Field Employee Declarations

DMW submitted declarations from a number of its current and former employees including five field employees. With varying levels of specificity, each of the field employees averred they were paid for all time worked for DMW. Those that made mention of attending safety meetings, training, and drug testing, or performing work before leaving to a jobsite or after returning from a jobsite, all averred they were paid for their time. Some specifically mentioned their understanding they were to be paid from the moment they arrived at the DMW yard to the time they left the yard at the end of the day. Some mentioned adding additional time to their timecards to allow for any additional work at the end of the day, or to match a customer's "four-hour minimum arrangement with DMW." Some mentioned rounding time up or down to the nearest half hour. At least two of the field employees stated that, when they had noticed their compensation did not match the hours they actually worked, DMW corrected the error.

The field employees were relatively consistent in stating there was enough time to take lunch breaks and rest breaks during downtime or standby time. However, one declarant stated "[s]ome days are busy and there is hardly time for a break" but also noted "some days you'll spend five or ten hours sitting in the truck with nothing to do." Some expressly stated no one at DMW told them when they could or could not take a break, and that the policy was to "take them when you can." As one declarant described it, "The Drill Site Manager would always let you know what was going on so you could plan around when they actually needed you." Another stated DMW told him he "was supposed to take a lunch for every five hours of work" but that many employees did not take a "formal lunch." He indicated he never kept track of his lunch time because "most of the 'work' was just sitting in the truck waiting for the rig to be ready for us." He "just wrote down that [he] took a break every five hours." No one told him he could not leave a jobsite for a meal break "but that was kind of a gray area. [He] did not usually feel like

18.

[he] could leave, and most of the time [he] had [his] lunch with [him], so [he] didn't want to leave." Another stated, he was never told he could not leave a jobsite, but most of the time it would not be possible to leave a jobsite and get back within a half an hour.

With regard to issues raised by plaintiffs' reimbursement claims, four field employees stated DMW gave them fire-retardant clothing or a "uniform." Some stated they already had steel-toe boots and several noted DMW provided them with vouchers for steel-toe boots either yearly or in "[s]ome years." Some declarants noted DMW provided them with cell phones. Others noted DMW did not supply them with cell phones but acknowledged cell phones were not required—DMW simply needed a means of contacting them.

One declarant, Brandon Green, also worked as a dispatcher for a period of time with DMW. According to his declaration, off-site jobs would get scheduled when a "Drill Site Manager managing a rig in the field" would call and tell DMW it needed a crew. Typically, DMW would receive four hours' notice to get a crew on-site but it could be as little as two hours' notice. DMW would then figure out which employees should respond based on "things like who was working that day, who had been out all night on a long job, who was already going to be working close by, etc." DMW would then call or text the employees. "If someone did not respond to dispatch[, he] would simply go on to the next person" and put the nonresponding employee on the bottom of the call list—the only "consequence[] for an isolated incident." "If it happened repeatedly management would get involved." At some point, DMW "moved to a more formal system where[,] instead of just calling dispatch and asking for time off[,] people would have set days off every week, and they could trade them with other people or request other times off with a form."

b. Emily Pittman

Emily Pittman worked for DMW in various administrative positions from 2010 to January 2019. During her first few years at DMW she was required to review all

19.

employee timesheets and "worked closely with dispatch" to make sure they were accurate. She averred field employees got paid from the moment they arrived at the yard to start the day and would continue to get paid until they left the yard after returning from a jobsite. All time, including preparation time and unloading time was paid. If there was a problem with an employee's paycheck, it would get fixed "right away." Moreover, she never heard any complaints from field workers that they were unable to take meal or rest breaks.

Pittman stated, "DMW did not require most employees to have a cell phone." "[D]ispatch would call employees at whatever number the employee supplied."

### c. Megan Miller-Julien

Megan Miller-Julien was the vice-president of operations for DMW. She oversaw "billing, safety, payroll and HR departments." From 2011 to the date of her declaration, she worked with DMW's administrative staff. She was "generally . . . responsible for employee onboarding." She stated DMW has posted "standard California and Federal employment notices" and "Wage Order 16" to inform DMW employees of their employment rights including, without limitation, "their right to minimum wage," "overtime pay, and meal and rest breaks."

Miller-Julien explained that DMW employees use paper timecards to log their hours for the week. In addition, DMW uses "daily job-completion form ('JCF') for each job they are working on." Typically, the lead person on the job will complete the JCF for the group. JCF's are used "to create estimates and invoices" and "to create a calendar for each employee showing the hours they worked in the week." The JCF, calendar, and timecards "are all verified against each other." Discrepancies between them are addressed to the employees and, if corrections are necessary, the employee initials the correction. If an employee claims his or her pay is short, DMW investigates and, if substantiated, DMW fixes the problem.

20.

Miller-Julien averred that "DMW's policy is that employees are paid 'gate to gate'. This means that as soon as they come in the gate to the facility they are on the clock, and they stay on the clock until they go out the gate to go home for the day." (Boldface omitted.) "Employees generally round the time they write to the nearest half-hour." She denied telling employees that " 'gate to gate' meant they were not getting paid for their time in the yard getting ready for their first job, or after they got back to the yard for the day." "DMW employees are advised of the exact opposite." She denies telling employees "to record less time on their timecards than they actually worked." She denied ever telling employees to "falsify their timecards," to "write down that they had taken a meal, even if they had not," or "what time to write down regarding when they took a meal."

Miller-Julien indicated employees are instructed to take meal breaks and to record them on their timecards. "Given the kind of work DMW does, we expect field employees to take their breaks around their hands-on work." In 2013, DMW revised its timecards to reflect DMW's policy that employees exercise their right to rest and meal breaks. Since then, "employees could note right on their timecard if they had missed a break." "In 2014 [DMW] revised the employee handbook to bring it in line with California law" and to "reflect the actual policy in place." All time spent completing paperwork and attending safety meetings, drug/alcohol testing, and training is on paid time.

According to Miller-Julien, "DMW provides all field employees with fire-resistant uniforms to wear" as well as "hard hats, safety glasses, gloves, and all other safety-related clothing and equipment." DMW's "expectation is that employees show up wearing their work clothes, which are simply pants and a shirt, and boots." DMW supplies cell phones to some employees but does not require other employees to own a cell phone. Employees do need some sort of telephone in order for dispatch to schedule them for work.

21.

d. <u>Miller</u>

Miller was the president and chief executive officer of DMW. He owns DMW with his spouse and oversees DMW's day-to-day operations. He explained "DMW is primarily an oilfield welding services operation." "At any given time DMW has 12 to 15 field employees." During the period between 2011 and 2016, "DMW employed a total of about 200 people due to high rates of turnover, which is caused by the nature of the work and the varying industry demand for DMW's services." "Most of these employees work in two-man teams consisting of a welder and a welder's helper" but there are "numerous other types of field employees."

Miller corroborated Miller-Julien's averments concerning the use of timecards, JCF's, and calendars to show an employee's hours worked; and the policy of paying employees " 'gate to gate' " and for safety meetings. He denied ever informing employees "to record less time on their timecards than they actually worked," to record meal breaks that had not been taken, or that they could not leave a jobsite during their meal breaks.

He stated employees are issued $150 boot vouchers every year and that "lead employees are given a DMW-issued cell phone" to "coordinate jobs within the field." However, lower-level employees (e.g., firewatch or welder's helpers) are not typically issued cell phones. Dispatch contacts them "during their off-hours using whatever phone number they have provided to us."

**DISCUSSION**

**I.    THRESHOLD QUESTION AS TO ALCARAZ'S STANDING**

DMW contends both Mann and Alcaraz lack standing to bring this appeal and that this court is precluded from reaching the merits of the appeal. As mentioned in footnote 1, *ante*, plaintiffs' counsel conceded during oral argument that their office had lost contact with Mann after appellate briefing was completed and that the instant appeal should now be construed as being brought only on behalf of Alcaraz. Based on this

22.

concession, we find that Mann has abandoned the appeal and do not address his standing in this opinion. However, for reasons discussed below, we conclude Alcaraz has standing to pursue the appeal.

In support of its argument that Alcaraz lacks standing to appeal, DMW notes "Alcaraz dismissed his only cause of action," i.e., the PAGA cause of action. DMW contends " '[a] person who was a party, but by dismissal ceased to be, is without legal standing as a litigant or as an appellant,' " quoting *Bates v. John Deere Co.* (1983) 148 Cal.App.3d 40, 53. DMW further contends "Alcaraz's residual status as a member of the putative class does not make him a party to the litigation," citing *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 266 ["Unnamed parties [in a class action] . . . are not considered 'parties' to the litigation."].)

Plaintiffs argue the PAGA claim was dismissed without prejudice in order to render the subject order appealable. (See *Munoz v. Chipotle Mexican Grill, Inc.* (2015) 238 Cal.App.4th 291, 310 [holding that the "presence of PAGA claims following a trial court's denial of class certification precludes application of the death knell doctrine"].) Plaintiffs note that "both [plaintiffs] sought class certification as to the class and subclasses at issue on appeal" and they "thoroughly hashed out how . . . Alcaraz is an adequate representative," and "the trial court treated . . . Alcaraz as a class representative and made a ruling impacting his rights." Plaintiffs also argue, "if a court concludes a named plaintiff can no longer suitably represent the class, it should afford the plaintiff the opportunity to amend his complaint, to redefine the class, or to add new individual plaintiffs, in order to establish a suitable representative," citing *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 989 (*Jones*).

As for Alcaraz's standing, although the governing complaint does seem to segregate the class action claims as having been brought by Mann and the PAGA claim by Alcaraz, it states in the opening paragraph that the governing complaint is being brought by both plaintiffs. Moreover, the PAGA claim itself, which appears as the sixth

23.

cause of action in the governing complaint, "re-alleges and incorporates by reference" all the preceding causes of action including all the primary claims upon which the derivative claims are based. Finally, we also acknowledge that Alcaraz, as moving party, requested leave to amend the governing complaint in the event the court found he was not a suitable class representative but the trial court did not rule on the request.

Based on the above, we conclude Alcaraz has standing to appeal in this matter.

## II.   STANDARD OF REVIEW

"We review the trial court's ruling for abuse of discretion. 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [Accordingly,] a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]" [citation]. . . . "Any valid pertinent reason stated will be sufficient to uphold the order." ' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 (*Sav-On*).)  " 'A trial court is generally afforded great latitude in granting or denying class certification . . . .' " (*Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 716 (*Benton*).)

"Unlike the general rule compelling a reviewing court to scrutinize the result below, not the trial court's rationale, we analyze the propriety of an order denying class certification based solely on the lower court's stated reason for the decision.  [Citations.] Thus we review only the reasons advanced by the trial court and ignore any other grounds which might support denial." (*Weinstat v. Dentsply Internat., Inc.*, *supra*, 180 Cal.App.4th at pp. 1223–1224, italics omitted.)

" '[A] certification ruling not supported by substantial evidence cannot stand.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 328.)  However, " '[w]here a certification order turns on inferences to be drawn from the facts, " 'the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Ibid*.)  We "[p]resum[e] in favor of the

24.

certification order . . . the existence of every fact the trial court could reasonably deduce from the record." (*Id*. at p. 329.) "[W]e have no authority to substitute our own judgment for the trial court's" in crediting one party's evidence over conflicting evidence submitted by the other party. (*Id*. at p. 331.) A court may decide the question of whether class action litigation is superior to separate lawsuits according to the preponderance of the evidence. (*Id*. at p. 332.)

## III. GENERAL CLASS ACTION PRINCIPLES

Code of Civil Procedure section 382 provides, "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

"Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*).) "[T]he superiority criterion is manifest in the determination that a class action brought under Code of Civil Procedure section 382 would produce 'substantial benefits' to the litigants and the judicial system." (*Schneider v. Vennard* (1986) 183 Cal.App.3d 1340, 1347.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) "A class action may be certified even if it is unlikely the class will eventually prevail on the merits, as certification in such a situation allows a defendant to obtain a

favorable judgment binding all class members. 'It is far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff.' " (*McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 449.)

## IV. THE OVERARCHING CLASS IS ASCERTAINABLE

"The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members." (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) In addressing whether the overarching class and subclasses are ascertainable, the trial court wrote, " '[w]hether a class is "ascertainable" within the meaning of [Code of Civil Procedure section] 382 is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying the class members[,]' " citing, among other authorities, *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1271 (*Reyes*). It likewise wrote, "[a] precise, objective and presently ascertainable class definition is required. [Citation.] The definition should define the class in terms of objective characteristics and common transactional facts to enable identification of the class members."

The trial court stated, "under [p]laintiffs' definitions, it appears easy for a putative class member to easily identify from the definition whether he or she falls into one of the defined subclass[es] and what the [sub]classes seek to address (i.e., missed meal/rest periods), but the [overarching] 'class' only identifies putative class members and not what they seek to address—so it cannot be ascertained, if all the subclasses were not certified, what exactly the [overarching] 'class' seeks to address. However, [DMW]

26.

raises no objection to the class/subclass definitions so it could be said that the class/subclasses[10] are sufficiently defined."

The trial court acknowledged plaintiffs' contentions the overarching class " 'is ascertainable from [DMW's] timekeeping and pay records' " and " '[t]here are at least 155 members of the class, and the class is sufficiently numerous,' " but found plaintiffs did not cite to evidence to support the contentions. Referencing plaintiffs' counsel's declaration which stated "[i]n or around March, 2016, Simpluris Inc., the third party administrator selected by the parties to administer the *Belaire* process, sent notices to the 155 class members on the class list Defendant provided Simpluris," the court determined plaintiffs "did not provide that list as evidence (or any other basis on which the Court can ascertain the number of the class/subclasses) to support the number . . . or how [it] was ascertained or whether [DMW] agrees this is the number in the class. Nor does the [m]otion indicate what that number represents—the entire class? Some subclass? Or some other combination?" The court presumed DMW did not dispute the class size since it did not address the issues in opposition to plaintiffs' motion but, nevertheless, found plaintiffs did not meet their burden of establishing class size.

Plaintiffs argue they "defined the class as 'all current and former California-based hourly-paid or non-exempt field employees who worked for [DMW] at any time during the period from May 14, 2011 to class certification' " and it is unnecessary for them to identify "what the class members seek to address." They argue "[t]he proper place to decipher the relationship between the defined class and the legal claims they seek to address is not at the pre-certification stage but rather, through the class certification order and notice to the class," citing *Hicks v. Kaufman & Broad Home Corp*. (2001) 89 Cal.App.4th 908, 915 (*Hicks*) and *Cohen v. DIRECTV, Inc*. (2009) 178 Cal.App.4th 966,

---

**10** Given the trial court's determination the overarching class is not ascertainable, we interpret the court's use of the term "class/subclass" as referring only to subclasses.

27.

975 (*Cohen*). Plaintiffs contend the class description sets forth common characteristics (i.e., "hourly paid or non-exempt [employees] who worked from May 14, 2011 through class certification"), a means of readily identifying class members (i.e., DMW's "timekeeping and pay records"), and allows individuals to self-identify with the class.

In support of the subject order, DMW argues that the trial court used the correct legal standards, i.e., those set forth in *Reyes* and *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955 (*Noel*); that "neither *Hicks* nor *Noel* overturned *Reyes* or removed [p]laintiffs' burden to establish the size of the class"; and that the court correctly required plaintiffs to "submit some admissible evidence regarding the number of class members."

We conclude plaintiffs have the better argument.

In *Hicks*, the plaintiffs were purchasers of a home built by the defendants. The plaintiffs alleged the defendants used improper construction materials (i.e., Fibermesh) resulting in " 'inherently defective' " "concrete slab foundations." (*Hicks*, *supra*, 89 Cal.App.4th at p. 912.) The plaintiffs brought a class action lawsuit under several theories and defined the class as " 'All persons or entities who own one or more homes [in specified . . . developments] which were constructed and marketed by [the defendants] in which "Fibermesh" . . . was utilized in the concrete foundation slabs as a substitute for . . . welded wire mesh with manifested damage or defect due to the . . . substitution.' " (*Ibid.*) The court denied class certification based, in part, on its determination the class was not ascertainable. (*Id.* at p. 913.)

The appellate court determined the trial court erred by concluding " 'class membership . . . [cannot] be ascertained without an individualized analysis of each putative class member's concrete slabs [because] manifest damage to a slab must exist as a precondition for class membership.' " (*Hicks*, *supra*, 89 Cal.App.4th at p. 914.) The appellate court noted "[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata," and determined "[m]anifest damage to a slab is not a 'precondition' for class membership. It

28.

is, if anything, an element in the proof of [the defendant's] liability and relates to the existence of common questions of law and fact, not ascertainability of the class." (*Ibid.*, fns. omitted.)

To illustrate the point, the *Hicks* court pointed to the holding in *Block v. Major League Baseball*.[11] (*Hicks*, *supra*, 89 Cal.App.4th at pp. 914–915.) In *Block*, the plaintiffs were major league baseball players who brought a class action lawsuit alleging the defendants unlawfully used "their names, voices, signatures and photographs in various commercial products without consent or compensation." (*Hicks*, at p. 914, citing *Block*, *supra*, 65 Cal.App.4th at p. 541.) "The class was defined as ' "all major league baseball players who played major league baseball before 1947, or, if they are now deceased, their heirs or beneficiaries." ' " (*Hicks*, at pp. 914–915, quoting *Block*, at p. 541.) The *Block* court held the class was ascertainable (" 'i.e., approximately 800 men (or their heirs and beneficiaries) who played major league baseball prior to 1947' " but denied certification due to the predominance of individualized issues of law or fact. (*Hicks*, at p. 915, citing *Block*, at p. 545.) Thus, *Block* "found the class ascertainable even though it was not defined as former major league players whose voices, likenesses, etc., [the] defendants used without their 'consent or compensation.' " (*Hicks*, at p. 915, italics omitted.) "[T]he [*Block*] court properly treated the lack of consent or compensation as an ultimate fact each class member would have to prove to establish liability." (*Ibid.*)

*Hicks* explained "ascertainability can be better achieved by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary. The class certification order and notice to the class are the proper places to explain the

---

[11] *Block v. Major League Baseball* (1998) 65 Cal.App.4th 538 (*Block*).

relationship between the defined class and the legal claims being made in the case." (*Hicks*, *supra*, 89 Cal.App.4th at p. 915.)

In *Cohen*, the plaintiffs filed a class action lawsuit alleging the defendant fraudulently induced customers to enter into subscription packages based on a false promise to provide a specific high resolution picture to subscribers. (*Cohen*, *supra*, 178 Cal.App.4th at pp. 969–970.) The plaintiffs sought to "certify a class defined as follows: 'Residents of the United States of America who subscribed to [the defendant's] High Definition Programming Package.' " (*Id*. at p. 970.) The trial court found the definition too broad in that it would include subscribers who had not relied on the alleged fraudulent misrepresentations. (*Id*. at pp. 971-972.) Although the appellate court ended up affirming the trial court's order denying class certification, the appellate court concluded the class definition was "precise, with objective characteristics and transactional parameters, and can be determined by [the defendant's] own account records. No more is needed." (*Id.* at p. 976.)

In *Noel*, our high court examined past court opinions that addressed the issue of class ascertainability and the various views of Courts of Appeal on the subject. (*Noel*, *supra*, 7 Cal.5th at pp. 969–979.) Having considered the various approaches taken, the high court concluded "objectives of [the ascertainability] requirement are best achieved by regarding a class as ascertainable when it is defined 'in terms of objective characteristics and common transactional facts' that make 'the ultimate identification of class members possible when that identification becomes necessary.' [Citation.] We regard this standard as including class definitions that are 'sufficient to allow a member of [the class] to identify himself or herself as having a right to recover based on the [class] description.' " (*Id*. at p. 980.)

The *Noel* court did mention *Reyes* as one of several cases in which the courts provided for a more "exacting inquiry" of ascertainability—i.e., the one used by the trial court here—"calling for an examination into '(1) the class definition, (2) the size of the

30.

class and (3) the means of identifying class members." (*Noel*, *supra*, 7 Cal.5th at p. 974.) The *Noel* court wrote, "insofar as the three-factor approach . . . could be read to demand a more exacting inquiry than the approach we endorse today, we disapprove of it . . . ." (*Id.* at p. 986, fn. 15.)

Here, the trial court required a more exacting inquiry than proscribed in *Noel*. The class designation of "all current and former California-based hourly-paid or non-exempt field employees who worked for [DMW] at any time during the period from May 14, 2011 to class certification" is sufficient to define the class. It is based on objective characteristics and common transactional facts and will allow the subsequent identification of class members based upon DMW's payroll and other business records. Similarly, each of the subclasses is ascertainable under the appropriate inquiry set forth in *Noel*. For purposes of ascertainability, it was unnecessary for plaintiffs to state what the class seeks to address. "The class certification order and notice to the class are the proper places to explain the relationship between the defined class and the legal claims being made in the case." (*Hicks*, *supra*, 89 Cal.App.4th at p. 915.)

## V. THE OVERARCHING CLASS AND SUBCLASSES ARE SUFFICIENTLY NUMEROUS

" 'The ultimate issue in evaluating [the numerosity] factor is whether the class is too large to make joinder practicable . . . .' " (*Hendershot v. Ready to Roll Transportation, Inc.* (2014) 228 Cal.App.4th 1213, 1222.) Class sizes as few as 10, 28, and 42, have been upheld. (*Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934, disapproved on unrelated grounds in *Noel*, *supra*, 7 Cal.5th at p. 986, fn. 15.)

Here, plaintiffs contend the class size consists of " 'at least 155 members . . . and . . . is sufficiently numerous.' " The trial court determined plaintiffs' counsel's statement that " '[i]n or around March, 2016, Simpluris Inc., the third party administrator selected by the parties to administer the *Belaire* process, sent notices to the 155 class members on the class list [DMW] provided Simpluris" is insufficient to support the contention. In the

absence of other evidence, we might be inclined to agree with the court. However, we believe the evidence is sufficient to support the numerosity requirement.

The *Belaire* process derives from *Belaire*, *supra*, 149 Cal.App.4th 554. In *Belaire*, "the trial court granted a motion to compel [the defendant employer] to provide the names and contact information of all current and former . . . employees [of the defendant] and adopted a proposed notice to those individuals that would have required them to object in writing in order to prevent information about them from being disclosed to the real parties in interest." (*Id.* at p. 556.) As described in one practice guide, "[t]he named plaintiff may seek precertification discovery to identify and obtain contact information . . . for members of the putative class . . . . Such information is generally discoverable, subject to privacy protections for the putative class members [citation]." (Edmon and Karnow, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2022) § 14:135.3, italics omitted.) The process is described as facilitating communication between the lead plaintiff and class members "who might assist in prosecuting the case." (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 373.) Likewise, it can be used to identify individuals who might substitute in as a plaintiff in the event a named plaintiff is without standing to pursue the claim. (See *CashCall, Inc. v. Superior Court* (2008) 159 Cal.App.4th 273, 290.)

A trial court is authorized to "consider the totality of the evidence in determining whether the plaintiffs have presented evidence sufficient to establish the requirements for class certification." (*Jones*, *supra*, 221 Cal.App.4th at p. 998.) Here, Miller averred "DMW is primarily an oilfield welding services operation." "At any given time DMW has 12 to 15 field employees." During the period between 2011 and 2016, "DMW employed a total of about 200 people due to high rates of turnover, which is caused by the nature of the work and the varying industry demand for DMW's services." "Most of these employees work in two-man teams consisting of a welder and a welder's helper" but there are "numerous other types of field employees." This is evidence that the

32.

overarching class is sufficiently numerous. Moreover, we understand plaintiffs' theory to be that all DMW field employees within the defined class are likewise within each of the defined subclasses. Thus, in terms of numerosity, there appears to be complete identity between the overarching class and the subclasses.

Given the nature of the *Belaire* process and Miller's own admissions, we conclude the trial courts determination the evidence is insufficient to establish class size is not supported by substantial evidence.

## VI.  COMMON QUESTIONS OF LAW AND FACT PREDOMINATE WITH REGARD TO THE REST AND MEAL BREAK CLAIMS AND STEEL-TOE BOOT REIMBURSEMENT CLAIMS

"The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members. [Citations.]  The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Sav-On*, *supra*, 34 Cal.4th at p. 326.)

"To establish these factors, the party seeking certification must show 'that questions of law or fact common to the class predominate over the questions affecting the individual members . . . . [Citation.]  In essence, this means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants." ' " (S*oderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 143, quoting *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913–914.)

"As the focus in a certification dispute is on what type of questions—common or

33.

individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On*, *supra*, 34 Cal.4th at p. 327.)

"That calculation of individual damages may at some point be required does not foreclose the possibility of taking common evidence . . . ." (*Sav-On*, *supra*, 34 Cal.4th at p. 332.) " '[A] class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages.' " (*Id.* at p. 333.) Denial of class certification has been upheld on grounds "there was no common method to prove the *fact of liability* on a classwide basis" to support class certification. (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 308 (*ABM*).) "[O]ther cases have held that individualized issues regarding *proof of the amount of damages . . .* does not defeat a class action so long as there are *common questions of liability* amenable to class resolution. [Citations.]" (*ABM*, at pp. 308–309, citing *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 232-240, disapproved on unrelated grounds in *Noel*, *supra*, 7 Cal.5th at p. 986, fn. 15; *Jones*, *supra*, 221 Cal.App.4th at p. 997; *Benton*, *supra*, 220 Cal.App.4th at p. 726.) "The common theme in these cases is that the plaintiff's theory of liability could be determined based on common uniform policies applicable to the class as a whole." (*ABM*, at p. 309.)

### A. Unlike the Subclasses, the Overarching Class, as Defined, Did Not Reference Any Alleged Violation or Wrongdoing on the Part of DMW and, Consequently, Did Not Lend Itself to Analysis of Whether Common Issues of Law or Fact Predominated

Plaintiffs contend "the trial court entirely failed to analyze whether there existed a well-defined community of interest as to the [overarching] class, instead conflating the 'class' definition's ascertainability analysis with the community of interest analysis for

the subclasses," and "this Court must remand to the trial court to retrieve the trial court's basis for denials as to the 'class.' " The conflation referenced by plaintiffs seemingly relates to the fact the court's ascertainability determination for the overarching class was premised, in part, on the lack of an identification of what the class members seek to address. Although that consideration was unnecessary in analyzing ascertainability, it was necessary to determine whether a well-defined community of interest existed.

The trial court's comment that "the [overarching] 'class' only identifies putative class members and not what they seek to address" highlights the fact that the overarching class, by all appearances, is merely a conglomeration of the subclasses. There is no separate cause of action applicable to the overarching class that does not implicate, in some way, one of the causes of action asserted on behalf of the subclasses. Thus, the only way to determine whether there are predominate common questions of law or fact, whether the class representatives have claims or defenses typical of the overarching class, and whether the plaintiffs can adequately represent the overarching class is by conducting the analysis with respect to each subclass.

### B. Common Questions of Law and Fact Predominate with Regard to Liability Under the Rest Break Claims

The trial court noted DMW's 2011 handbook provided " '[w]hen working conditions permit, and pending a supervisor's approval, employees are entitled to one 10 minute break for every 4 hours worked' " and the 2014 handbook "also provides for meal and rest periods." It further noted that Miller "testified that 60-minute meal periods are only for office employees, not employees working out in the field at worksite locations" and that "there was no meal break policy applicable to employees working in the field from 2011 to 2014 that authorized and permitted employees to take 30-minute off-duty meal breaks during their shift when working in the field."

The trial court noted plaintiffs' declarants "indicate that [they] were never allowed a meal/break period because 'when they were out in the field because the nature of the

35.

work did not allow them to take off-premises, duty[-]free, uninterrupted 30-minute meal breaks,' " but determined "[DMW] only had to allow duty[-]free/uninterrupted meal breaks; [and] that employees could not go off premises due to the location of the work site [was] not a requirement for [DMW]." The court characterized the process described by plaintiffs' declarants as follows: "they went out, welded and had to babysit the weld to ensure it cooled properly, so could not take any breaks which would 'leave [*sic*] to wastefulness' and client dissatisfaction and unless there was downtime no breaks were taken."

The trial court noted DMW's position that "there is no requirement for a written meal break policy and that employees had the ability to schedule their breaks" as averred by DMW's declarants and that DMW's "declarants all state there was plenty of time to take rest and meal breaks and they were never denied any request to take any break."

Based on the above, the trial court determined "the break issues are not susceptible of common proof for all members of the proposed and the class members would be required to litigate numerous and substantial questions determining their individual right to recover following a class judgment on common issues . . . ." According to the court, those individual issues "requires questioning of . . . class member[s] as to dates they claim they were not provided with breaks, if they were specifically denied breaks, number of hours each worked, who was on their teams, what the other team members say with respect to breaks, where they were in the field, i.e.[,] were they accessible to going 'off premises' within the allot[t]ed break period, or if they were denied leaving the premises for breaks, did they ask for any meal/rest breaks." The court found plaintiffs provided no evidence of a "uniform policy that [DMW] denied any meal/rest breaks."

Plaintiffs claim it was error for the trial court to analyze the rest and meal break subclasses together but cite no authority for the proposition. " 'When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' " (*In re A.C.* (2017) 13 Cal.App.5th 661, 672.)

Plaintiffs further contend the trial court's determination that they "failed to provide any evidence of a uniform policy that [DMW] denied rest breaks" is not supported by substantial evidence—citing the 2011 handbook's provision that " '[w]hen working conditions permit, and pending a supervisor's approval, employees are entitled to one 10 minute break for every 4 hours worked.' " We agree.

In *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*), the defendant employer had a written policy that "employees receive one 10-minute rest break per four hours worked . . . ." (*Id*. at p. 1033.) The court stated, "[c]lasswide liability could be established through common proof if [the plaintiff] were able to demonstrate that, for example, [the defendant employer] under this uniform policy refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours." (*Ibid*.)

DMW argues *Brinker* does not aid plaintiffs because *Brinker* ruled certification should follow "*if* [the] plaintiff could show a uniform policy to deny second rest breaks on shifts between six and eight hours long" but here "the trial court concluded that there was no uniform corporate policy to deny rest breaks and that common issues did not predominate"—a determination, DMW argues, is supported by substantial evidence. DMW further argues that the existence of contrary evidence is not a legitimate ground on which to overturn the trial court's decision.

As mentioned above, "[t]he certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) "As the focus in a certification dispute is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove

amenable to class treatment." (*Id.* at p. 327.) The trial court did not adhere to this principal in its subject order. Rather, it decided the issue on the merits.

"State law obligates employers to afford their nonexempt employees meal periods and rest periods during the workday." (*Brinker*, *supra*, 53 Cal.4th at p. 1018; see §§ 226.7; 512; Cal. Code Regs., tit. 8, § 11160 [Industrial Welfare Commission (IWC) Wage Order No. 16-2001 (hereinafter, Wage Order 16)].) In *Brinker*, the plaintiffs alleged the defendant employer failed to provide its employees with rest breaks, meal breaks, or "premium wages in lieu of meal breaks, required by law" (*Brinker*, at p. 1018), "required [its] employees to work off-the-clock during meal periods and engaged in time shaving, [i.e.,] unlawfully altering employee time records to misreport the amount of time worked and break time taken." (*Id.* at p. 1019.) The trial court found a predominance of common issues compared to individual issues and granted class certification. (*Id.* at p. 1020.) The Court of Appeal reversed as to the three subclasses and the California Supreme Court granted review. (*Id.* at p. 1017.)

The high court noted a trial court "must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence." (*Brinker*, *supra*, 53 Cal.4th at p. 1024.) "[A] trial court must examine the . . . theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate." (*Id.* at p. 1025.)

The high court also considered the applicable wage order which read: " 'Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3½) hours.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1028.) It summarized the effect of the wage

order as follows: "Employees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." (*Id.* at p. 1029.)

The court then considered the allegations of the complaint and focused on "the theory that [the defendant employer] adopted a uniform corporate rest break policy that violates [the applicable wage order] because it fails to give full effect to the 'major fraction' language of [the wage order]." (*Brinker*, *supra*, 53 Cal.4th at p. 1032.) Similar to the case at bar, the written policy allowed employees "one 10-minute rest break per four hours worked": " 'If I work over 3.5 hours during my shift, I understand that I am eligible for one ten minute rest break for each four hours that I work.' " (*Id.* at p. 1033.) The court concluded "[c]lasswide liability could be established through common proof if [the plaintiff] were able to demonstrate that, for example, [the defendant employer] under this uniform policy refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours. Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." (*Ibid.*)

The court noted, "[a]n employer is required to authorize and permit the amount of rest break time called for under the wage order for its industry. If it does not—if, for example, it adopts a uniform policy authorizing and permitting only one rest break for employees working a seven-hour shift when two are required—it has violated the wage order and is liable." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.) It determined the plaintiff had submitted "substantial evidence of a uniform rest break policy authorizing breaks only for each full four hours worked" and that the trial court's certification decision should not have been disturbed. (*Ibid.*) In closing, the *Brinker* court stated, "[t]he theory of liability—that [the defendant employer] has a uniform policy, and that that policy,

39.

measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Ibid.*)

Here, Wage Order 16 is similar to that discussed in *Brinker*. It provides, in relevant part:

> "(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable, shall be in the middle of each work period. Nothing in this provision shall prevent an employer from staggering rest periods to avoid interruption in the flow of work and to maintain continuous operations, or from scheduling rest periods to coincide with breaks in the flow of work that occur in the course of the workday. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time for every four (4) hours worked, *or major fraction thereof. . . .*

> "(B) Rest periods need not be authorized in limited circumstances . . . . However, the employer shall make-up the missed rest period within the same work day or compensate the employee for the missed ten (10) minutes of rest time at his or her regular rate of pay within the same pay period. [¶] . . . [¶]

> "(D) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the rest period was not provided. In cases where a valid collective bargaining agreement provides final and binding mechanism for resolving disputes regarding enforcement of the rest period provisions, the collective bargaining agreement will prevail." (Cal. Code Regs., tit. 8, § 11160, subd. 11(A), (B), (D), italics added.)

Wage Order 16 contains the same "major fraction thereof" language at issue in *Brinker* and DMW's policy is quite similar to that in *Brinker*. DMW's 2011 handbook provides, "When working conditions permit, and pending a supervisor's approval, employees are entitled to one 10 minute break for every 4 hours worked[,]" but does not include the "major fraction thereof" language. The existence of the policy, its implementation, and its legality are all matters subject to common proof.

40.

DMW's written policy for rest breaks for nonexempt employees did change in or about 2014 to comport with the law. The 2014 handbook reads, in relevant part: "[y]ou are entitled to one (1) 10-minute rest break for every four (4) hours you work (or major fraction thereof, which is defined as greater than (2) hours). If you work more than six (6) hours and up to 10 hours in a workday, you will receive one (1) rest break during the first half of your shift and one (1) rest break during the second half of your shift. If you work more than 10 hours and up to 14 hours, you will be entitled to an additional paid 10-minute rest break."

However, the tenor of plaintiffs' proffered declarations is that, notwithstanding any written policy, DMW, as a matter of practice, routinely denied its employees such breaks. According to plaintiffs' declarants, the workload was such that time for breaks was largely nonexistent; downtime only occurred between jobs or if upon arrival, the jobsite was not ready for the field employees to begin their work; breaks were not possible once the welding process was underway and the welds and surrounding areas needed to be constantly monitored. Moreover, plaintiffs' declarants say DMW pressured its employees to "finish the day's work as quickly and efficiently as possible" to enable them to move to the next jobsite and to avoid excessive billing to their clients.

In *Brinker*, the court stated, "an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks. (*Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962–963 [35 Cal.Rptr.3d 243]; see also *Jaimez v. Daiohs USA, Inc.* [2010] 181 Cal.App.4th [1286,] 1304–1305 [proof of common scheduling policy that made taking breaks extremely difficult would show violation]; *Dilts v. Penske Logistics, LLC* (S.D.Cal. 2010) 267 F.R.D. 625, 638 [indicating informal anti-meal-break policy 'enforced through "ridicule" or "reprimand" ' would be illegal].) The wage orders and governing statute do not countenance an employer's exerting coercion against the taking of, creating incentives to forgo, or otherwise encouraging the skipping of legally protected breaks." (*Brinker*,

41.

*supra*, 53 Cal.4th at p. 1040.) We see no reason why a similar routine practice by an employer, if true, would not violate rest-break requirements.

Whether there was a companywide practice of undermining the employee rest-break policy contained in the 2014 handbook is a matter of common proof. Moreover, defenses to that theory of liability would likewise be subject to common proof.

The trial court focused on *individualized* issues related to proof of *damages*. Evidence that "goes to individual issues concerning the right to recover damages . . . do not preclude class certification." (*Jones*, *supra*, 221 Cal.App.4th at p. 996.) "[T]he fact that individual inquiry might be necessary to determine whether individual employees were able to take breaks despite the defendant's allegedly unlawful policy (or unlawful lack of a policy) is not a proper basis for denying certification." (*Benton*, *supra*, 220 Cal.App.4th at p. 726.)

As discussed in section VII. below, individualized issues related to proof of damages and liability *are* relevant considerations for class certification. We conclude they are particularly relevant to the question of manageability. On remand, the trial court will need to analyze and determine whether such issues are manageable.[12] As mentioned in the preface, we are not directing the court to order class certification. The court may decide the class certification issue in its discretion upon completing an analysis of class certification issues consistent with this opinion.

We conclude there is a predominance of common questions of law and fact with respect to liability under plaintiffs' rest break claims.

---

[12] The court's manageability analysis is not necessarily limited to individualized issues related to proof of damages. Our determination that common issues of law and fact predominate as to proof of liability does not preclude the possibility that some individualized issues related to proof of liability may remain.

### C. Common Questions of Law and Fact Predominate with Regard to Liability Under the Meal Break Claims

The governing complaint alleges "as a pattern and practice," DMW "would regularly require . . . employees to work shifts exceeding 10 hours and did not provide [them] with meal periods" as required by law and "did not provide proper compensation for this failure"; employees "regularly did not receive uninterrupted meal and rest periods"; and DMW instructed its employees "to record that they took meal and rest periods, even if they did not take uninterrupted meal and rest periods." It alleges employees "would regularly be rushed, pressed to cut-short or interrupted and were not paid the proper meal and rest break premiums," and DMW's "payroll system failed to implement a system to compensate a premium pay."

Plaintiffs' declarants generally averred they were not permitted to take uninterrupted, off-duty breaks and instead were instructed by DMW dispatch to "eat something along the way to the next job site or if downtime allowed"; they were not allowed to leave the jobsite during such breaks because they "had to be present and ready to immediately resume work when welding was required"; they were not allowed to leave the site "unless the client's company man on-site specifically authorized it"; were never provided a second off-duty meal break when working shifts greater than 10 hours; and were never paid wage premiums for meal breaks that were denied. Plaintiffs' declarants indicated "[a]ll members of the crew . . . were required to write down 30-minute break[s]" whether taken or not.

The trial court noted there was "no meal break policy applicable to employees working in the field from 2011 to 2014 that authorized and permitted employees to take 30-minute off-duty meal breaks" per Miller's testimony. As with the rest break subclass, the court found that individual issues predominated requiring each class member to "litigate numerous and substantial questions determining their individual right to recover following a class judgment on common issues." The court indicated the same types of

43.

questions required for the rest break claims would also be required for the meal break claims.

Plaintiffs did provide evidence of a uniform practice to deny DMW employees their right to meal breaks or wage premiums in lieu thereof. As stated in *Brinker*, "an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." (*Brinker*, *supra*, 53 Cal.4th at p. 1040.) We see no reason why an employer should be permitted to engage in the same conduct simply because the written policy in place was not applicable to field employees as stated by Miller in his deposition.

Plaintiffs contend *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129 (*Bradley*) is instructive. In *Bradley*, the plaintiffs "presented evidence that under [the defendant employers'] uniform practice, none of the workers was provided, or given authorization to take, the required meal or rest breaks." (*Id.* at p. 1150.) The defendant employer "acknowledged it did not have a policy and did not know if the employees took meal or rest breaks. Five workers further submitted declarations confirming that they frequently did not take rest breaks because of the nature of the work and several believed they would be 'fired' if they stopped working to take a break. Likewise, these workers' declarations supported that they were not given the type of meal break required under the law—an uninterrupted 30 minutes during which they were free to use their time as they wished." (*Ibid*.) The court held the plaintiffs' theory that the defendant employer's "(uniform) lack of a rest and meal break policy and its (uniform) failure to authorize employees to take statutorily required rest and meal breaks" are matters of common proof. (*Ibid*., italics omitted.)

DMW argues *Bradley* does not support plaintiffs' case for class certification because it was based on undisputed evidence. However, the *Bradley* court acknowledged "an employer could potentially defend these claims by arguing that it did have an

informal or unwritten meal or rest break policy" but stated "this defense is also a matter of common proof." (*Bradley*, *supra*, 211 Cal.App.4th at p. 1150.)[13]

As with the rest break claims, the trial court chose to focus on *individualized* issues pertaining to the right to recover *damages*. However, whether or not such a policy or practice existed and its legality are subject to common proof. Evidence that "goes to individual issues concerning the right to recover damages . . . do not preclude class certification." (*Jones*, *supra*, 221 Cal.App.4th at p. 996.) "[T]he fact that individual inquiry might be necessary to determine whether individual employees were able to take breaks despite the defendant's allegedly unlawful policy (or unlawful lack of a policy) is not a proper basis for denying certification." (*Benton*, *supra*, 220 Cal.App.4th at p. 726.)

Again, individualized issues related to proof of damages and liability *are* relevant considerations for class certification. They are especially relevant to the question of manageability. (See section VII. below.) On remand, the trial court will need to analyze and determine whether such issues are manageable and may decide the class certification issue in its discretion upon completing an analysis of class certification issues consistent with this opinion.[14]

We conclude there is a predominance of common questions of law and fact with respect to liability under plaintiffs' meal break claims.

---

[13] Relatedly, DMW argues *Bradley* "made clear that its decision was distinguishable from cases in which 'the denial of class certification on meal/rest break claims' was based on conflicting evidence." (See *Bradley*, *supra*, 211 Cal.App.4th at p. 1154.) Yet, the single case *Bradley* cites to as representative of such cases was ordered depublished.

[14] See footnote 12, *ante*.

45.

**D.** *Common Questions of Law and Fact Do Not Predominate with Regard to Liability Under Overtime and Minimum Wage Claims*

**1.** **Common Questions of Law and Fact Do Not Predominate with Regard to Liability Under Plaintiffs' On-call Allegations**

In their governing complaint, plaintiffs allege DMW "as a corporate policy and practice, required its employees to remain 'on-call' with a restrictive response time, which required [its employees] to remain within a short distance from [DMW's] yard"; and that DMW would "threaten [its employees] if they were unable to report for work within one (1) hour of receiving a call . . . ."

The trial court noted plaintiffs' declarants averred they were "on call 24/7 even when they were not scheduled to work and must respond to work calls within 30-60 minutes when called to work or they would be reprimanded and 'starved out of work' from then on." The court remarked that plaintiffs essentially "assert that they were never not working and were unable to do any personal tasks such as travel or going out to dinner. Other than these declarations, [p]laintiffs provide no evidence that they were always on call and must respond within 30-60 minutes or they would be 'starved out of work.' " The court further noted DMW's declarants stated they "were not on-call 24/7, but were on call on their scheduled work days and they would have to respond within the 30-60 minute time frame, but if they failed to respond, no action was taken against them."

The trial court ruled "the overtime issues are not susceptible of common proof" and found individualized issues would predominate—i.e., "[the] dates [the employees] claim they were on call 24/7, why they thought that, when they failed to answer calls, and what actions were taken against them as to each time they failed to answer calls." The court determined plaintiffs "failed to provide evidence of a uniform policy that [DMW] required all field employees to be on call 24/7 even when they were not scheduled for work."

As noted in *Brinker*, " 'issues affecting the merits of a case may be enmeshed with class action requirements . . . .' " (*Brinker*, *supra*, 53 Cal.4th at p. 1023.) "When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them." (*Id*. at pp. 1023–1024.) The issue of on-call time presents such a situation.

"On-call waiting time may be compensable if it is spent primarily for the benefit of the employer and its business. (*Armour & Co. v. Wantock* (1944) 323 U.S. 126, 132 [89 L.Ed. 118, 65 S.Ct. 165] [time firefighters spent on call in the onsite fire hall was compensable, even though they spent time in 'idleness' and 'amusements'].) A determination of whether the on-call waiting time is spent predominantly for the employer's benefit depends on two considerations: (1) the parties' agreement, and (2) the degree to which the employee is free to engage in personal activities." (*Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 523 (*Gomez*).)

The *Gomez* court considered a "nonexclusive list of factors, none of which is dispositive, to determine whether [an] employee was free to engage in personal activities: '(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time." (*Gomez*, *supra*, 173 Cal.App.4th at p. 523.) Such considerations support the trial court's determination that individualized issues of law and fact predominate.

Plaintiffs' declarants have not provided evidence their off-duty time was "spent primarily for the benefit" of DMW or that they were not "free to engage in personal activities." (*Gomez*, *supra*, 173 Cal.App.4th at p. 523.) Plaintiffs have not pointed to any provision in either the 2011 handbook or 2014 handbook that required them to be on-call.

Although there is anecdotal evidence that some of the declarants were reprimanded when they "declined a call," there is a lack of evidence there was a companywide policy or practice of reprimands. Moreover, the nature of those reprimands is relatively nonspecific. The employees indicated if they "declined calls" their hours would be cut and they would be "starved out of work." However, a natural consequence of declining work is to endure a cut in hours and it is unclear what is meant by being "starved out of work" beyond not being able to accept a particular job. Moreover, the declarants' statements that others were eventually fired if they "continued to decline work" or "failed to respond" is speculative, not based on personal knowledge, and lacking in substantial evidentiary value.

The trial court could have inferred from the statements of plaintiffs' declarants, that plaintiffs were free to engage in their own personal activities notwithstanding any subjective feeling on their part that they could not do so; that the repercussions they suffered if they failed to respond or "declined a call" were they would not receive the jobs that were being solicited at the time; and that if hours were cut, it was a natural consequence of not accepting a given job.

Plaintiffs' reliance on *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524 (disapproved on unrelated grounds in *Noel*, *supra*, 7 Cal.5th at p. 986, fn. 15) does not aid them. In *Ghazaryan*, "[o]n any given day" the employer would "place[] between 40 and 45 [limousine] drivers in the field, and those drivers [would be] dispatched on 140 to 150 trips or runs." (*Id.* at p. 1528.) Some days were slower and others were busier. (*Ibid.*) The drivers were given shifts and typically received their "first few assignments before their shift beg[an] in part to allow them to plan their gap time" (*ibid.*)—i.e., the time during their shift between assigned trips (*id.* at p. 1527). Thus, the on-call time under consideration in *Ghazaryan* was time in which the employee was on his or her shift, in possession of the employer's limousine, and with the limousine on stand-by in

between trips. The employee was not off-duty as in the case before us. There is little similarity between the facts of *Ghazaryan* and the instant case.

Plaintiffs also cite to *Prince v. CLS Transportation, Inc.* (2004) 118 Cal.App.4th 1320 in support of their argument. In *Prince*, the plaintiffs filed a class action complaint and the defendant demurred on grounds it was " 'not an appropriate class action,' contending there is no well-defined community of interest, and that a class action is not superior to other methods of adjudicating" the claims. The trial court sustained the demurrer without leave to amend. (*Id*. at p. 1322.) On appeal, the appellate court merely concluded that class suitability should not have been decided at the pleading stage. (*Ibid.*) *Prince* is inapposite and does not aid plaintiffs' argument.

Based on all the above, there is substantial evidence to support the trial court's finding that a liability determination would predominantly involve individualized issues.

### 2. Common Questions of Law and Fact Do Not Predominate with Regard to Liability Under Plaintiffs' Claims They Were Not Compensated for Work Performed Before and After Jobs

The trial court noted plaintiffs' declarants averred they "were not paid from the time they arrived at the yard or when they came back from the field" and that they were "told or pressured to fill out their time cards . . . to reflect specific times." "[A]side from the declarations," the court wrote, "[p]laintiffs provide no evidence that shows that there was any policy to not pay employees for the time from when they arrived at the yard to when they left [the] yard. The employee time records do not show any policy; it only shows the time each individual employee put down on their time card." The court noted that DMW's declarants contradict the claims made by plaintiffs' declarants, that the former claimed they put the actual time worked on their timecards and were paid for that time, and that they were not pressured to report their time incorrectly.

As a result, the trial court found "the failure[-]to[-]pay[-]for[-]all[-]hours[-]worked issue is not susceptible of common proof for all members of the proposed class and the

class members would be required to litigate numerous and substantial questions determining their individual right to recover." The court noted each class member would have to be questioned regarding "[the] dates they claim they were pressured or told to fill in their time cards a certain way, what hours they allege they actually worked, when they arrived at the yard and when they left" and that plaintiffs did not provide evidence other than "the declarations of a uniform policy" that they were not paid for all time worked.

Plaintiffs argue merely that "[t]he trial court . . . improperly weighed [plaintiffs'] declarations against [DMW's] declarations in making its incorrect determination that the minimum wage and overtime subclasses are not susceptible to common proof," and that it "used improper criteria by weighing the merits of [plaintiffs'] claims with [DMW's] defenses, in lieu of concluding that [DMW's] defenses, namely class members being paid for all time worked, are susceptible to common proof." We disagree.

Although the trial court did note the difference between the statements of plaintiffs' declarants and DMW's declarants, the court did not rule on the merits of plaintiffs' minimum wage and overtime claims. Rather, the court determined plaintiffs had not met their burden in demonstrating common proof issues predominated over individualized proof issues in deciding liability issues.

Here, plaintiffs' declarants noted "DMW's dispatch and payroll instructed [they are] only compensated . . . from the time when dispatch instructed [them] to be at the DMW yard in Bakersfield." Plaintiffs' declarants interpreted this instruction in such a way that they only reported their time commencing when they "began travelling from the yard to the jobsite." Although they contend they worked prior to traveling from the yard to the jobsite, the instructions they state they received actually authorized them to report this time on their timecards. That plaintiffs' declarants did not report the time they worked consistent with DMW's instructions does not constitute evidence of a policy or practice to deny them compensation for such time. Statements to the effect that they "w[ere] not allowed to record . . . all of the hours [they] worked" are conclusory and

50.

devoid of evidentiary substance. Similarly, the statement that "DMW limited the time [they] could put on the time cards based on what they were able to bill clients," is conclusory and does not evidence that actual hours worked were less than what was billed to clients. Finally, the claim that, "due to DMW's dispatch and payroll expectation[s]," additional work was performed does not provide any basis upon which plaintiffs' declarants were able to discern said expectations. Based on this record, the trial court was entitled to infer that plaintiffs' declarants relied on their own subjective and inconsistent interpretations of statements made by DMW (e.g., interpreting an instruction that compensable time begins when they arrive at DMW's yard, as an instruction that compensable time begins when they leave the yard for a jobsite) and their own subjective belief of DMW's expectations without an objective basis for arriving at that conclusion. Based on this record, we cannot conclude the court's determination is unsupported by substantial evidence, or rested on improper criteria or erroneous legal assumptions.

**E.** ***Common Questions of Law and Fact Do Not Predominate with Regard to Liability Under Reimbursement Claims for Cell Phone Usage but Do Predominate with Regard to Liability Under Reimbursement Claims for Steel-toe Boots***

The trial court noted plaintiffs' assertion "they were required to wear steel-toed boots but not provided with the boots and were required to answer dispatch calls on their personal cell phone while on-call, but were no[t] reimbursed for this use." The trial court noted the only evidence in support of plaintiffs' claims were the declarations submitted in support of the class certification motion. The court also noted plaintiffs did not provide portions of the 2014 handbook that pertained to cell phone/mobile device and dress policies. Relying on *Townley v. BJ's Restaurants, Inc.* (2019) 37 Cal.App.5th 179 (*Townley*), the court denied certification of the reimbursement class because "[p]laintiffs . . . have not argued that steel-toed boots were 'part of a uniform' or 'were not usual and generally usable' in the field welding occupation." As for cell phone usage, the trial

51.

court noted plaintiffs' failed to present "evidence that use of a personal cell phone was . . . mandatory for work," citing *Herrera v. Zumiez, Inc.* (9th Cir. 2020) 953 F.3d 1063, 1078.

As to cell phone usage, plaintiffs cite to *Cochran v. Schwan's Home Service, Inc.* (2014) 228 Cal.App.4th 1137, 1144, 1145, for the proposition that " '[i]f an employee is required to make work-related calls on a personal cell phone, then he or she is incurring an expense for purposes of section 2802[,]' "[15] and " '[t]o show liability under section 2802, an employee need only show that he or she was required to use a personal cell phone to make work-related calls, and he or she was not reimbursed.' "

Plaintiffs' declarants did indicate they used their cell phone to send and receive work-related messages. However, they did not provide any evidence that their employer *required* them to use their cell phones for this purpose. Even assuming plaintiffs' declarants were entitled to reimbursement for such cell phone usage under section 2802, the evidence does not rise to the level of establishing a classwide common policy or practice.

With regard to steel-toe boots, plaintiffs argue *Townley* is "inapposite as the matter involved a grant of a motion for summary judgment that was taken up on appeal," and "inapposite as it related to non-slip shoes." (See *Townley*, *supra*, 37 Cal.App.5th at pp. 180–181.) Plaintiffs point to the statement in *Townley* that "[the plaintiff] does not cite any authority holding that an employer is required, under section 2802, to reimburse an employee for basic, nonuniform wardrobe items, such as the slip-resistant shoes at issue in this case." (*Id.* at p. 185.) Plaintiffs contend "steel-toe boots are <u>not</u> basic, nonuniform wardrobe items, unlike the slip-resistant shoes discussed in *Townley*," citing

---

**15** Section 2802 provides, in relevant part, "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . ." (*Id.*, subd. (a).)

*Clark v. QG Printing II, LLC* (E.D.Cal. Sept. 18, 2020, No. 1:18-cv-00899-AWI-EPG) 2020 U.S.Dist. Lexis 171610 at page *51.

In support of the trial court's determination, DMW argues courts are not "barred from denying class certification on the ground that the claim is legally meritless, so long as both sides have an opportunity to brief the issue," citing *Linder*, *supra*, 23 Cal.4th at page 443. In *Linder*, the court cautioned against such an approach but did not foreclose it. (*Ibid.*) The court wrote, "we are not convinced that certification should be conditioned upon a showing that class claims for relief are likely to prevail." (*Ibid.*) It then stated, "in keeping with the principle that trial courts should be afforded flexibility in dealing with class actions [citations], we do not foreclose the possibility that, in the exceptional case where the defense has no other reasonable pretrial means to challenge the merits of a claim to be asserted by a proposed class, the trial court may, after giving the parties notice and an opportunity to brief the merits question, refuse class certification because the claim lacks merit as a matter of law. Furthermore, we see nothing to prevent a court from considering the legal sufficiency of claims when ruling on certification where both sides jointly request such action." (*Ibid.*)

DMW does not contend it had no other reasonable pretrial means to challenge the merits of plaintiffs' reimbursement claims. Nor has it pointed to anywhere in the record where the parties jointly requested the trial court determine the merits of the claim, or where the trial court gave the parties notice of its intent to do so and an opportunity to brief the issue, and we have found no such record references.

We conclude the trial court improperly ruled on the merits of plaintiffs' claims for reimbursement of steel-toe boots. Plaintiffs did not have fair notice the trial court would rule on those grounds and, consequently, the class certification issue should not have been adjudicated on that basis.

We further agree with plaintiffs that there is sufficient evidence in the record that DMW had a policy of requiring its employees to wear steel-toe boots, and that whether DMW has liability under section 2802 is susceptible to common proof with regard to factual and legal questions.

## VII. REMAINING ISSUES TO BE DECIDED BY THE TRIAL COURT

### A. *Manageability*

The trial court's ruling on manageability of individualized issues correctly noted "[t]he proponent of class certification must demonstrate that the proposed class action is manageable" (see *Washington Mutual Bank v. Superior Court*, *supra*, 24 Cal.4th at p. 922; accord, *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836, 850) and that it must " 'carefully weigh the respective benefits and burdens of a class action, and . . . permit its maintenance only where substantial benefits will be accrued by both litigants and the courts alike' " quoting *Reyes*, *supra*, 196 Cal.App.3d at page 1275. (Accord, *Global Minerals*, at p. 849.) "In certifying a class action, the court must . . . conclude that litigation of individual issues . . . can be managed fairly and efficiently." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28–29.) "[T]he manageability of individual issues is just as important as the existence of common questions uniting the proposed class." (*Id.* at p. 29.) The manageability of individualized issues of class members' damages is likewise an appropriate and necessary consideration. (See *Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 754 ["Manageability of the class with regard to proof of the amount of each class member's damages may present an independent ground for failure to certify the class."])

The trial court noted the grounds upon which DMW opposed manageability and that the evidence DMW submitted was supportive of its opposition. However, the court did not make a manageability determination—perhaps because it found common issues did not predominate as to any of the class claims.

54.

However, given our determination that common questions of law and fact do predominate as to liability under the rest and meal break claims, and the steel-toe boot reimbursement claims, it is necessary for the trial court to decide the issue of manageability of individualized issues pertaining to those claims—including, but not necessarily limited to, those that concern proof of damages.[16]

In this regard, we reiterate that the trial court correctly identified numerous individualized issues that may impact whether class certification is appropriate for the rest and meal break claims. The individualized issues, as framed by the court, included determining "dates [employees] claim they were not provided with breaks, if they were specifically denied breaks, number of hours each worked, who was on their teams, what the other team members say with respect to breaks, where they were in the field, i.e.[,] were they accessible to going 'off premises' within the allot[t]ed break period, or if they were denied leaving the premises for breaks, did they ask for any meal/rest breaks."

In remanding the matter back to the trial court, we wish to stress that it is the proponent of class certification who bears the burden of demonstrating individual issues are manageable. (*Washington Mutual Bank v. Superior Court*, *supra*, 24 Cal.4th at pp. 924–925.) We express no opinion on how the court should rule on the manageability question.

### B. Class Representative Issues

In order to determine whether a well-defined community of interest exists for plaintiffs' rest and meal break claims and steel-toe boot reimbursement claims, the trial court must also determine whether the proposed class representative has claims or defenses typical of the class, and whether the proposed class representative can adequately represent the class. (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) Because the trial court concluded common questions did not predominate as to any of plaintiffs' claims,

---

[16] See footnote 12, *ante*.

the court did not have occasion to consider questions pertaining to the suitability of the proposed class representative to serve in that capacity. Given today's ruling, it is necessary the court do so.[17]

In the event the court determines the proposed class representative is not a suitable candidate to serve, the trial court shall determine whether plaintiffs should be granted leave to amend to propose a new class representative.

### C.    *Derivative Claims*

The trial court did not consider class certification with regard to the derivative claims. To the extent those derivative claims are (or may be) premised on plaintiffs' rest and meal break claims, and steel-toe boot reimbursement claims, the court must consider the relevant class certification issues to determine whether class action is appropriate for those derivative claims.

## DISPOSITION

The trial court's order denying class certification with regard to plaintiffs' proposed overtime and minimum wage subclasses is affirmed. The trial court's order denying class certification of the business reimbursement subclass is affirmed except as to claims related to the reimbursement for steel-toe boots.

The trial court's order denying class certification as to the remainder of plaintiffs' proposed subclasses (i.e., the meal period, alternative meal period, rest break and business reimbursement [for steel-toe boots] subclasses) is reversed and remanded to the trial court to reconsider and redetermine class certification in light of the views expressed in this opinion. The trial court shall allow the parties further briefing opportunities with respect to the following: (1) the determination of whether individualized issues pertaining to claims of the remaining subclasses subject to potential class certification are

---

[17] We express no opinion on the effect of the arbitration agreement on Alcaraz's ability to serve as class representative.

56.

manageable and whether class certification will result in substantial benefits for the litigants and court alike; (2) the determination of whether the proposed class representative has claims or defenses typical of the class, and whether he or she can adequately represent the class; (3) in the event plaintiffs desire to propose a different class representative, whether plaintiffs should be granted leave to amend for that purpose; and (4) whether the derivative claims (i.e., plaintiffs' third, fourth, and seventh causes of action) are appropriate for class certification consistent with this opinion.

In the interest of justice, each party shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


LEVY, Acting P. J.

WE CONCUR:


POOCHIGIAN, J.


DETJEN, J.